# EXHIBIT 1

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

Unified Patents, LLC
Petitioner

v.

MCOM IP, LLC
Patent Owner

Case No. IPR2022-00055

**PETITION FOR *INTER PARTES* REVIEW OF
U.S. PATENT NO. 8,862,508
CHALLENGING CLAIMS 1, 3-7, 9-13, 15-16, AND 18-20**

U. S. PATENT NO. 8,862,508
Petition for *Inter Partes* Review

TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................1

II.     MANDATORY NOTICES ......................................................................1

        A.      Real Party-in-Interest ..................................................................1

        B.      Related Matters.............................................................................1

        C.      Notice of Counsel and Service Information..................................4

III.    CERTIFICATION OF GROUNDS FOR STANDING ...........................5

IV.     OVERVIEW OF CHALLENGE AND RELIEF REQUESTED.................5

        A.      Prior Art.......................................................................................5

        B.      Grounds of Challenge...................................................................6

V.      OVERVIEW OF THE '508 PATENT .....................................................6

        A.      '508 Patent....................................................................................6

        B.      '508 Patent File History ...............................................................8

VI.     OVERVIEW OF PRIOR ART ................................................................9

        A.      Lawlor...........................................................................................9

        B.      De Leo ........................................................................................11

        C.      Bouve..........................................................................................11

        D.      Looney........................................................................................12

        E.      Kawan.........................................................................................13

        F.      Arsenault ....................................................................................14

VII.    LEVEL OF ORDINARY SKILL IN THE ART.....................................14

VIII.   CLAIM CONSTRUCTION ...................................................................15

IX.     GROUNDS OF UNPATENTABILITY....................................................15

U.S. PATENT 8,862,508
Petition for *Inter Partes* Review

A.     Ground I:  Claims 1, 3, 5-7, 9, and 11-12 are obvious over Lawlor in view of Bouve, De Leo, and Looney. ............................................15

    1.     Claim 1 ...............................................................................15

        (a)     Preamble: A method for constructing a unified electronic banking environment, said method comprising the steps of:...................................................15

        (b)     Element [1.A]: providing at least one common multi-channel server coupled to more than one e-banking touch points and also coupled to at least one computer system configured with at least one control console, said more than one e-banking touch points and said at least one computer system being provided in locations remote from the other; ......................................................................16

                (i)  A POSITA Would Have Been Motivated to Apply the Teachings of Bouve to Lawlor ......................21

                (ii) A POSITA would have had a Reasonable Expectation of Success ...................................................23

        (c)     Element [1.B]: and further wherein said more than one plurality of e-banking touch points are comprised of at least two different types of e-banking touch point devices, each of which comprise one or more of an automatic teller/transaction machine (ATM), a self service coin counter (SSCC), a kiosk, a digital signage display, an online accessible banking website, a personal digital assistant (PDA), a personal computer (PC), a laptop, a wireless device, or a combination of two or more thereof, and wherein at least one of said e-banking touch points is in communication with one or more financial institutions through said multi-channel server; .............24

                (i)  A POSITA Would Have Been Motivated to Apply the Teachings of De Leo to Lawlor....................27

U.S. PATENT 8,862,508
Petition for *Inter Partes* Review

(ii) A POSITA Would Have Had a Reasonable Expectation of Success ...................................................29

(d)  Element [1.C]: receiving an actionable input from at least one e-banking touch point ..................................30

(e)  Element [1.D]: retrieving previously stored data associated with said actionable input, wherein said previously stored data is accessible to any one of said e-banking touch points, and said previously stored data comprises data from one or more financial institutions and one or more user-defined preferences; ...................................................31

(f)  Element [1.E]: delivering said retrieved data to said at least one e-banking touch point transmitting said actionable input; .......................................................34

(g)  Element [1.F1]: storing transactional usage data associated with said at least one e-banking touch point transmitting said actionable input, ......................35

(h)  Element [1.F2]: wherein said stored transactional usage data is accessible by any one of said more than one e-banking touch points and said at least one computer system ......................................................36

(i) A POSITA Would Have Been Motivated to Apply the Teachings of Bouve and Lawlor....................38

(ii) A POSITA Would Have Had a Reasonable Expectation of Success ..................................................39

(i)  Element [1.G]: monitoring via said server an active session in real-time for selection of targeted marketing content correlated to said user-defined preferences; ...................................................39

(i) A POSITA Would Have Been Motivated to Apply the Teachings of De Leo to Lawlor....................43

U.S. PATENT 8,862,508
Petition for *Inter Partes* Review

(ii) A POSITA Would Have Had a Reasonable Expectation of Success ...................................................44

(j)    Element [1.H]: subsequent to said monitoring, selecting in real-time said targeted marketing content correlated to said user-defined preferences; and ..............................................................45

(i) A POSITA Would Have Been Motivated to Apply the Teachings of Looney to Lawlor.....................47

(i) A POSITA Would Have Had a Reasonable Expectation of Success ...................................................49

(k)    Element [1.I]: transmitting in real-time said targeted marketing content during said active session to at least one of said e-banking touch points for acceptance, rejection, or no response by a user, wherein said response by said user is used during said active session to determine whether transmission of additional information related to said marketing content occurs during said active session.............................................................................49

(i) A POSITA Would Have Been Motivated to Apply the Teachings of De Leo to Lawlor.....................51

(ii) A POSITA Would Have Had a Reasonable Expectation of Success ...................................................53

2.    Claim 3: wherein said user-defined preferences comprise one or more of a customer name, a language to be used in connection with one or more of said touch points, an account for conducting transactions, and a monetary amount to be the subject of select transactions................................................54

3.    Claim 5: wherein said method permits distribution of one or more of advertisements, messages, offers and promotions. .....55

4.    Claim 6: further comprising the step of transmitting additional information related to said marketing content during said active session.........................................................56

U.S. PATENT 8,862,508
Petition for *Inter Partes* Review

5.      Claim 7 ........................................................................................ 57

        (a)     Preamble: A method for constructing a unified electronic banking environment, said method comprising the steps of: .................................................... 57

        (b)     Element [7.A]: providing a common multi-channel server coupled to one or more e-banking touch points and also coupled to one or more computer systems, wherein each computer system is associated with a financial institution, said e-banking touch points being provided in locations remote from the other: .................................................... 57

        (c)     Element [7.B]: each of which comprise one or more of an automatic teller/transaction machine (ATM), a self-service coin counter (SSCC), a kiosk, a digital signage display, an online accessible banking website, a personal digital assistant (PDA), a personal computer (PC), a laptop, a wireless device, or a combination of two or more thereof, and wherein at least one of said e-banking touch points is in communication with one or more financial institutions through said multi-channel server; .................................................... 57

        (d)     Element [7.C]: receiving an actionable input from at least one e-banking touch point; ................................. 58

        (e)     Element [7.D]: retrieving previously stored data associated with said actionable input, wherein said previously stored data is accessible to any one of said e-banking touch points, and said previously stored data comprises data from one or more financial institutions and one or more user-defined preferences; .................................................... 58

        (f)     Element [7.E]: delivering said retrieved data to said at least one e-banking touch point transmitting said actionable input; .................................................... 58

(g)    Element [7.F]: storing transactional usage data associated with said at least one e-banking touch point transmitting said actionable input, wherein said stored transactional usage data is accessible by any one of said e-banking touch points and said one or more computer systems; ...................................... 59

(h)    Element [7.G]: monitoring via said server said active session in real-time for selection of targeted marketing content correlated to said user-defined preferences; ..................................................................... 59

(i)    Element [7.H]: subsequent to said monitoring, selecting in real-time said targeted marketing content correlated to said user-defined preferences; and ............................................................ 59

(j)    Element [7.I]: transmitting in real-time said targeted marketing content during said active session to at least one of said e-banking touch points for acceptance, rejection, or no response by a user, wherein said response by said user is used during said active session to determine whether transmission of additional information related to said marketing content occurs during said active session. ........................................................................... 59

6.    Claim 9: wherein said user-defined preferences comprise one or more of a customer name, a language to be used in connection with one or more of said touch points, an account for conducting transactions, and a monetary amount to be the subject of select transactions. ............................................... 60

7.    Claim 11: wherein said method permits distribution of one or more of advertisements, messages, offers and promotions. ..................................................................... 60

8.    Claim 12: further comprising the step of transmitting additional information related to said marketing content during said active session. ........................................................ 60

B.     Ground II:  Claims 13, 15-16, and 19-20 are obvious over Lawlor in view of Bouve, De Leo, Looney, and Kawan. ...............................61

    1.    Claim 13 .......................................................................61

        (a)    Preamble: A unified electronic banking system, said system comprising:...................................................61

        (b)    Element [13.A]: a common multi-channel server, wherein said multi-channel server is communicatively coupled to one or more independent computer systems:......................................61

            (i) A POSITA would have been Motivated to Apply the Teachings of Kawan to Lawlor ....................63

            (ii) A POSITA would have had a Reasonable Expectation of Success ...................................................64

        (c)    Element [13.B]: wherein each of one or more independent computer systems is associated with an independent financial institution, and each of said computer systems is communicatively coupled to said multi-channel server;............................65

        (d)    Element [13.C]: one or more e-banking touch points, each of which comprise one or more of an automatic teller/transaction machine (ATM), a self-service coin counter (SSCC), a kiosk, a digital signage display, an online accessible banking website, a personal digital assistant (PDA), a personal computer (PC), a laptop, a wireless device, or a combination of two or more thereof, wherein one or more of said e-banking touch points are communicatively coupled to said multi-channel server, and wherein at least one of said e-banking touch points is in communication with one or more financial institutions through said multi-channel server; ......................................................65

U.S. PATENT 8,862,508
Petition for *Inter Partes* Review

(e)    Element [13.D]: a data storage device, wherein transactional usage data associated with a transaction initiated by a user through one of said e-banking touch points is stored in said data storage device and accessed by one or more of said other e-banking touch points; and .................................66

(f)    Element [13.E]: wherein said active session is monitored via said server in real-time for selection of targeted marketing content correlated to said user-defined preferences, said targeted marketing content correlated to said user-defined preferences is selected subsequent to said monitoring and transmitted in real-time to at least one of said e-banking touch points for acceptance, rejection, or no response by a user, and wherein said response by said user is used during said active session to determine whether transmission of additional information related to said marketing content occurs during said active session....................................66

2.    Claim 15: wherein said user-defined preferences comprise one or more of a customer name, a language to be used in connection with one or more of said touch points, an account for conducting transactions, and a monetary amount to be the subject of select transactions...............................................67

3.    Claim 16: wherein said transactional usage data may be used to analyze specific customer habits. .........................................67

4.    Claim 19: wherein said system, permits distribution of one or more of advertisements, messages, offers and promotions. ..................................................................................68

5.    Claim 20: wherein said additional information related to said marketing content is transmitted during said active session.....68

C.    Ground III:  Claims 4 and 10 are obvious over Lawlor in view of Bouve, De Leo, Looney, and Arsenault...............................................69

1.      Claim 4: further comprising the step of determining whether said marketing content is classified as being one or more of current or approved content .........................................................69

(i) A POSITA would have been Motivated to Apply the Teachings of Arsenault to Lawlor ................69

(ii) A POSITA would have had a Reasonable Expectation of Success ...................................................70

2.      Claim 10: further comprising the step of determining whether said marketing content is classified as being one or more of current or approved content.........................................71

D.      Ground IV: Claim 18 is obvious over Lawlor in view of Bouve, De Leo, Looney, Kawan, and Arsenault ...............................................71

3.      Claim 18: wherein said marketing content is classified as being one or more of current or approved content. ..................71

X.      SECONDARY CONSIDERATIONS OF NONOBVIOUSNESS ..............71

XI.     DISCRETIONARY FACTORS FAVOR INSTITUTION ...........................72

A.      35 U.S.C. § 314(a).................................................................72

B.      35 U.S.C. § 325(d)................................................................73

XII.    CONCLUSION.........................................................................74

U. S. PATENT NO. 8,862,508
Petition for *Inter Partes* Review

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398 (2007) ..................................................22

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ........................................15

*Worlds Inc. v. Bungie, Inc.*, 903 F.3d 1237 (Fed. Cir. 2018) ....................................1

### FEDERAL STATUTES AND REGULATIONS

35 U.S.C. § 314(a) ................................................................................................6, 72

35 U.S.C. § 325(d) ....................................................................................................73

### ADMINISTRATIVE CASES

*Apple v. Fintiv*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) .......................72

*Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017-01586,
    Paper 8 (PTAB Dec. 15, 2017) ...........................................................................73

*Gen. Plastic Indus. Co. v. Canon Kabushiki Kaisha*, IPR2016-01357,
    Paper 19 (PTAB Sept. 6, 2017) ..........................................................................73

### RULES

37 C.F.R. § 42.8(b)(1) ................................................................................................1

37 C.F.R. § 42.8(b)(4) ................................................................................................5

37 C.F.R. § 42.10(b) ...................................................................................................4

37 C.F.R. § 42.22(a)(1) ..............................................................................................5

37 C.F.R. § 42.100(b) ...............................................................................................15

37 C.F.R. § 42.104(a) .................................................................................................5

37 C.F.R. § 42.104(b) ...........................................................................................5, 15

U. S. PATENT NO. 8,862,508
Petition for *Inter Partes* Review

## TABLE OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| 1001 | U.S. Patent No. 8,862,508 ("the '508 Patent") |
| 1002 | Declaration of Mr. Ian Jestice ("DecIJ.") |
| 1003 | File History of the '508 Patent |
| 1004 | U.S. Patent No. 5,870,724 ("Lawlor") |
| 1005 | U.S. P.G. Pub. No. 2003/0141360 ("De Leo") |
| 1006 | U.S. Patent No. 5,682,525 ("Bouve") |
| 1007 | U.S. Patent No. 7,925,549 ("Looney") |
| 1008 | U.S. Patent No. 5,796,832 ("Kawan") |
| 1009 | U.S. Patent No. 7,877,290 ("Arsenault") |
| 1010 | Declaration of Kevin Jakel |

## I.    INTRODUCTION

Unified Patents, LLC ("Unified" or "Petitioner") petitions for *inter partes* review ("IPR") and cancellation of claims 1, 3-7, 9-13, 15-16, and 18-20 ("Challenged Claims") of U.S. Patent No. 8,862,508 ("'508 Patent").

## II.    MANDATORY NOTICES

### A. Real Party-in-Interest

Under 37 C.F.R. § 42.8(b)(1), Petitioner certifies that Unified is the real party-in-interest and further certifies that no other party exercised control or could have exercised control over Unified's participation in this proceeding, the filing of this petition, or the conduct of any ensuing trial.  In view of *Worlds Inc. v. Bungie, Inc*., 903 F.3d 1237, 1242–44 (Fed. Cir. 2018), Unified has submitted a declaration in support of its certification.  Ex. 1010.

### B. Related Matters

According to assignment records, the '508 patent is assigned to MCOM IP. As of the filing date of this Petition, and to the best of Petitioner's knowledge, the '508 Patent is or has been involved in the litigations listed below, and in none of which Petitioner is involved.

- *MCOMP IP, LLC v. VANTAGE BANK TEXAS* 6:21-cv-00996 (W.D. Tex. Sept. 28, 2021)

- *MCOMP IP, LLC v. CORPORATE AMERICA FAMILY CREDIT UNION* 6:21-cv-02285 (W.D. Tex. Sept. 24, 2021)

- *MCOM IP, LLC v. UNISYS CORPORATION* 6:21-cv-02288 (W.D. Tex. Sept. 24, 2021)

- *MCOM IP, LLC v. BLEND LABS, INC.* 1:21-cv-07975 (S.D.N.Y Sept. 24, 2021)

- *MCOM IP, LLC v. WOODFOREST NATIONAL BANK ET AL* 6:21-cv-000989 (W.D. Tex. Sept. 24, 2021)

- *MCOM IP, LLC v. FCTI, INC.* 2:21-cv-07474 (C.D. Cal. Sept. 17, 2021)

- *MCOM IP, LLC v. NAUTILUS HYOSUNG AMERICAS, INC.* 6:21-cv-02215 (N.D. Tex. Sept. 17, 2021)

- *MCOM IP, LLC v. INTERNATIONAL BUSINESS MACHINES CORPORATION* 6:21-cv-00966(W.D. Tex. Sept. 17, 2021)

- *MCOM IP, LLC v. FISERV, INC.* 6:21-cv-00827 (W.D. Tex. Aug. 10, 2021)

- *MCOM IP, LLC v. FIS GLOBAL, INC.* 6:21-cv-00826 (W.D. Tex. Aug. 10, 2021)

- *MCOM IP, LLC v. MX TECHNOLOGIES, INC.* 6:21-cv-00829 (W.D. Tex. Aug. 10, 2021)

- *MCOM IP, LLC v. AVAYA HOLDINGS CORP.* 3:21-cv-01550 (N.D. Tex. July 21, 2021)

- *MCOM IP, LLC v. DIEBOLD NIXDORF, INC.* 6:21-cv-00698 (W.D. Tex. July 21, 2021)

- *MCOM IP, LLC v. UNICOM SYSTEMS, INC.* 2:21-cv-00168 (E.D. Tex. May 14, 2021)

- *MCOM IP, LLC v. WELLS FARGO* 6:21-cv-00500 (W.D. Tex. May 14, 2021)

- *MCOM IP, LLC v. INFOSYS, INC.* 6:21-cv-00499 (W.D. Tex. May 14, 2021)

- *MCOM IP, LLC v. FIRST TECH FEDERAL CREDIT UNION* 6:21-cv-00480 (W.D. Tex. May 07, 2021)

- *MCOM IP, LLC v. REDPOINT GLOBAL INC.* 1:21-cv-10657 (D. Mass April 20, 2021)

- *MCOM IP, LLC v. REDPOINT GLOBAL INC.* 6:21-cv-00325 (W.D. Tex. April 05, 2021)

- *MCOM IP, LLC v. PNC FINANCIAL SERVICES GROUP, CO., INC.* 6:21-cv-00217 (W.D. Tex. March 05, 2021)

- *MCOM IP, LLC v. US BANK, NATIONAL ASSOCIATION CO.* 6:21-cv-00216 (W.D. Tex. March 05, 2021)

- *MCOM IP, LLC v. BBVA USA BANCSHARES, INC.* 6:21-cv-00218 (W.D. Tex. March 05, 2021)

- *MCOM IP, LLC v. DH CORPORATION* 6:21-cv-00197 (W.D. Tex. March 02, 2021)

- *MCOM IP, LLC v. CSI, INC.* 6:21-cv-00196 (W.D. Tex. March 02, 2021)

- *MCOM IP, LLC v. NCR CORP.* 6:21-cv-00325 (W.D. Tex. April 4, 2021)

- *MCOM IP, LLC v. FIRST TECH FEDERAL CREDIT UNION* 2:21-cv-00168 (E.D. Tex. May. 14, 2021)

- *MCOM IP, LLC v. DIEBOLD NIXEFORD, INC.* 3:21-cv-01550 (W.D. Tex. July 2, 2021)

- *MCOM IP, LLC v. AVAYA HOLDINGS CORP.* 6:21-cv-00698 (N.D. Tex. July 2, 2021)

- *MCOM IP, LLC v. UNICOM SYSTEMS, INC.* 6:21-cv-00500 (W.D. Tex. May. 7, 2021)

- *MCOM IP, LLC v. WELLS FARGO* 6:21-cv-00827 (W.D. Tex. Aug. 10, 2021)

U.S. PATENT 8,862,508
Petition for *Inter Partes* Review

- *MCOM IP, LLC v. FISERV, INC.* 6:21-cv-00827 (W.D. Tex. Aug. 10, 2021)

- *MCOM IP, LLC v. FIS GLOBAL, INC.* 6:21-cv-00826 (W.D. Tex. Aug. 10, 2021)

- *MCOM IP, LLC v. MX TECHNOLOGIES, INC.* 6:21-cv-00829 (W.D. Tex. Aug. 10, 2021)

## C. Notice of Counsel and Service Information

Petitioner's counsel are:

| Lead Counsel | Back-Up Counsel |
|---|---|
| David M. Tennant<br>Registration No. 48,362<br>Allen & Overy LLP<br>1101 New York Ave NW<br>Washington, D.C.  20005<br>Phone: (202) 683 3891 (phone)<br>Email: david.tennant@allenovery.com | Ashraf Fawzy (Reg. No. 67,914)<br>David C. Seastrunk (Reg. No. 73,723)<br>Unified Patents, LLC<br>4445 Willard Ave., Suite 600<br>Chevy Chase, MD 20815<br>Phone: (202) 871-0110<br>Email: afawzy@unifiedpatents.com<br>Email: david@unifiedpatents.com<br><br>Victoria A. Moffa<br>*PHV pending*<br>Allen & Overy LLP<br>1101 New York Ave NW<br>Washington, D.C.  20005<br>Phone: (202) 725 6869<br>Email: victoria.moffa@allenovery.com |

A Power of Attorney is being filed concurrently with this Petition in accordance with 37 C.F.R. § 42.10(b).  Petitioner consents to electronic service. Pursuant to 37 C.F.R. § 42.8(b)(4), all services and communication counsel email addresses are indicated above.

4

U.S. PATENT 8,862,508
Petition for *Inter Partes* Review

## III.  CERTIFICATION OF GROUNDS FOR STANDING

Petitioner certifies pursuant to Rule 42.104(a) that the '508 patent is available for IPR and that Petitioner is not barred or estopped from requesting an IPR challenging the patent claims.

## IV.  OVERVIEW OF CHALLENGE AND RELIEF REQUESTED

Pursuant to Rules 42.22(a)(1) and 42.104(b)(1)–(2), Petitioner challenges claims 1, 3-7, 9-13, 15-16, and 18-20 of the '508 patent.  The '508 Patent has filing and issue dates of November 14, 2006 and October 24, 2014, respectively.  The '508 Patent claims priority to a provisional application filed on November 11, 2005.

### A. Prior Art

The following references are pertinent to the grounds explained below:

| Patent No. | Filing Date | Issue Date | Prior Art Basis |
|---|---|---|---|
| 5,870,724 ("Lawlor") | June 6, 1995 | February 9, 1999 | § 102(a), (b), (e) |
| Pub. No. US 2003/0141360 ("De Leo") | September 26, 2002 | July 31, 2003 | § 102(a), (b), (e) |
| 5,682,525 ("Bouve") | January 11 1995 | October 28, 1997 | § 102(a), (b), (e) |
| 7,925,549 ("Looney") | August 12, 2005 | April 12, 2011 (published April 6, 2006) | § 102(a), (e) |
| 5,796,832 ("Kawan") | November 13, 1995 | August 18, 1998 | § 102(a), (b), (e) |
| 7,877,290 ("Arsenault") | January 27, 2000 | January 25, 2011 | § 102(e) |

U.S. PATENT 8,862,508
Petition for *Inter Partes* Review

## B. Grounds of Challenge

This Petition, supported by Mr. Jestice's declaration (Ex. 1002), demonstrates a reasonable likelihood that Petitioner will prevail on at least one of the Challenged Claims and that the Challenged Claims are unpatentable.  *See* 35 U.S.C. § 314(a). Petitioner requests cancellation of the Challenged Claims under the following grounds:

- Ground I:  Claims 1, 3, 5-7, 9, and 11-12 are obvious over Lawlor in view of Bouve, De Leo, and Looney.

- Ground II:  Claims 13, 15-16, and 19-20 are obvious over Lawlor in view of Bouve, De Leo, Looney, and Kawan.

- Ground III:  Claims 4 and 10 are obvious over Lawlor in view of Bouve, De Leo, Looney, and Arsenault.

- Ground IV:  Claim 18 is obvious over Lawlor in view of Bouve, De Leo, Looney, Kawan, and Arsenault.

## V.    OVERVIEW OF THE '508 PATENT

### A.  '508 Patent

The '508 patent describes a well-known method for employing a unified banking environment that delivers personalized contents to users.   Ex. 1001 at Abstract.

The method uses a multi-channel server, more than one e-banking touch points (such as ATMs, PDAs, and personal computers, through which users access banking services), and a computer system. *See id.*, 3:23-64, 4:9-27; Ex. 1002, ¶¶52-53. In operation, a user enters an actionable input, such as a PIN number, using an e-banking touch point. *See* Ex. 1001, 4:52-5:7; Ex. 1002, ¶54. The server then retrieves and delivers data associated with the user's preferences and other user-related data to the e-banking touch point. *See id.* During examination, the Examiner focused on the purported novelty that, during the transaction, targeted marketing content will be selected and sent to the e-banking touch point. *See* Ex. 1001, 6:42-62; Ex. 1002, ¶¶55-56; *see infra* Section V.B. The user can then further interact with the marketing content to request additional information. *See id.*, 7:21-53; Ex. 1002, ¶55.

The '508 Patent illustrates the components and connections used in a certain embodiment of the above method in Figure 1 (reproduced below).



**FIG. 1**

The purported novelty of the'508 Patent does not stem from its generic components, but allegedly from applying the well-known concept of targeted advertisements to the context of banking. *See* Ex. 1002, ¶55.

### B. '508 Patent File History

U.S. Patent Application No. 11/559,894 ("894 Application"), which matured into the '508 patent, has filing and issue dates of November 14, 2006 and October 24, 2014, respectively. Ex. 1003, 23, 392.

The Examiner issued a series of rejections, and the applicant responded in due

course. *See generally* Ex. 1003. However, Applicant's arguments did not secure a

patent. These amendments included claiming the e-banking touch points to include

ATMs, PDAs, Kiosks and more, and adding the last three steps shown below. *See*

Ex. 1003, 23-25.

> monitoring via said server an active session in real-time for selection of targeted marketing content correlated to said user-defined preferences;
>
> subsequent to said monitoring, selecting in real-time said targeted marketing content correlated to said user-defined preferences; and
>
> transmitting in real-time said targeted marketing content during said active session to at least one of said e-banking touch points for acceptance, rejection, or no response by a user, wherein said response by said user is used during said active session to determine whether transmission of additional information related to said marketing content occurs during said active session.

However, as discussed below, these limitations and all others are squarely

disclosed in the prior art presented in this Petition.

## VI.  OVERVIEW OF PRIOR ART

### A. Lawlor

Lawlor describes a well-known method for conducting a financial transaction using a unified banking environment that delivers personalized contents to users. Ex. 1004, Fig. 1, 19:7-12; Ex. 1002, ¶¶66-67.  Like the '508 Patent, a user interacts with e-banking touch points, such as those shown in Figures 3 and 4 of Lawlor. *See* Ex. 1002, ¶¶67-69.



Ex. 1004, Figs. 3 & 4.

Using these or other e-banking touchpoints, a user can initiate banking transactions by entering their PIN.  *See* Ex. 1002, ¶69; Ex. 1004, 8:6-13, 20:63-21:3, 42:24-27.   After receiving a valid PIN, Lawlor's system retrieves information associated with the user and sends it to the e-banking touch point.  *See id*.

Lawlor's server will also store a user's transaction data from the e-banking touch points in a way that is accessible to other e-banking touch points and the bank. *See* Ex. 1002, ¶70; Ex. 1004, 42:47-43:9.

Lawlor sends the user targeted advertisements with which the user can interact.  *See* Ex. 1002, ¶71, Ex. 1004, 39:25-47.  For example, after the user views

the advertisement, they can indicate that they would like more information, which Lawlor provides by a subsequent call or mailing. *See id.*

Lawlor is analogous art to the '508 patent; it is from the same field of endeavor providing targeted advertisement in a banking environment and is reasonably pertinent to the particular problem the '508 patent was trying to solve of effectively distributing target advertisements in a banking environment. Ex. 1002, ¶66.

### B. De Leo

De Leo describes a well-known method of sending customers targeted advertisements while they interact with e-banking touch points such as ATMs. *See* Ex. 1005, [0082], [0090]-[0091]; Ex. 1002, ¶¶74-75. These advertisements are based on the user's personal preferences. *See* Ex. 1005, [0090]-[0091], [0111]; Ex. 1002, ¶¶74-75. De Leo allows users to interact with advertisements to request further information or materials. *See id.*

De Leo is analogous art to the '508 Patent; it is from the same field of endeavor providing targeted advertisements in the banking or other less traditional environments and seeks to resolve the same issues as the '508 Patent of delivering targeted advertisements in less traditional environments. *See id.*, ¶74.

### C. Bouve

Bouve describes a well-known concept of managing and retrieving information stored in a remote database by an operator with a computer system. *See*

Ex. 1006, Abstract, 5:39-52; Ex. 1002, ¶¶72-73. Specifically, Bouve discloses a method of entering and/or changing information inside a database such that the database can be modified. *See id.* Bouve describes that "an operator of the system 10 can add and modify the information with the database" using a computer with a display and keyboard. *See id.*, 5:39-52. Bouve explains that data stored in a database can be accessed as required and is not limited to being updated only by predetermined algorithms. *See id.*

Bouve is analogous art to the '508 Patent; it is in the same field of endeavor of managing information on a remote server and seeks to address problems of how operators without direct access to a server can manage a remote server and the information therein. *See* Ex. 1002, ¶72.

### D. Looney

Looney describes a well-known concept of delivering targeted advertisements in an environment with several different devices receiving content. Ex. 1007, 2:24-27, 8:60-64; *see* Ex. 1002 at ¶¶76-78. Looney describes that targeted advertisements "maximize return on investment (ROI) for the advertisers" and that real-time advertisements help further these goals. *See* Ex. 1007, 3:37-42; Ex. 1002, ¶¶76-78. Looney provides a "real-time advertisement targeting engine 246 [which] identifies and selects a personalized advertising message to be targeted to an individual that will have customer-specific information and content." *See* Ex. 1007, 8:60-64; Ex.

1002, ¶¶76-78.  Looney's engine relies on the same type of user-defined information as Lawlor, De Leo, and the '508 Patent.  *See* Ex. 1007, 2:24-27; Ex. 1002, ¶¶76-78.

Looney is analogous art to the '508 Patent; it is in the same field of endeavor of sending advertisements, particularly targeted advertisements, and seeks to solve the same issues of presenting the most suitable advertisement to a user based on information known about the user.  *See* Ex. 1002, ¶¶76, 78.

### E. Kawan

Kawan discloses a computerized banking system with remote access means to replace fixed location ATMs.  *See* Ex. 1008, Abstract; Ex. 1002, ¶¶249-250. Kawan discloses that a "financial institution, such as a consumer banking institution, utilizes an automated system, including a host computer, for maintaining records of customer accounts.  "These records are used to keep track of funds in the customer accounts, to enter debits and credits made to such accounts, and for other purposes." *See* Ex. 1008, 3:3-8.  Kawan further explains that users can use remote terminals to "review account balances, transfer funds, or perform other activities typically available on a fixed-location." *See id.*, 6:40-47.

Kawan is analogous art to the '508 Patent; it is in the same field of endeavor of providing banking access at locations other than just traditional ATMs and seeks to solve the same problem of managing transactions coming from sources other than fixed location ATMs.  *See* Ex. 1002, ¶249.

## F. Arsenault

Arsenault discloses a system and method for delivering advertisements in a diverse environment of remote devices.  *See* Ex. 1009, Abstract; Ex. 1002, ¶284.

Arsenault describes that "the IRD 36 will only cache [advertisement objects ("AOs")] that are currently contained in the [updated object lists ("ULO")] and will discard currently cached AOs that are not currently in the ULO (i.e., those that are expired)."  *See* Ex. 1009, 14:37-40.  That is, Arsenault will only store incoming advertisements if they are on the roster of current advertisements.  *See* Ex. 1002, ¶285.  In addition to checking if an incoming advertisement is current, Arsenault also determines whether the receiving device can actually handle the advertisement. *See id.*, 14:40-48; Ex. 1006, ¶286.  If the device lacks the sophistication required to display an advertisement properly, the advertisement is discarded.  *See id.*

Arsenault is analogous art to the '508 Patent; it is in the same field of endeavor of distributing advertisements to multiple different systems in a timely and efficient manner.  Arsenault also seeks to address the same issue as the '508 Patent in ensuring displayed advertisements are current and approved.  *See* Ex. 1002, ¶¶285-286.

## VII.  LEVEL OF ORDINARY SKILL IN THE ART

A person of ordinary skill in the art ("POSITA") at the time of the '508 patent's filing would have had at least (i) a Bachelor of Science in Computer Science, Computer Engineering, Information Systems, or the equivalent, and (ii)

approximately two years of experience with data/content selection and transmission-related fields.  *See* Ex. 1002, ¶¶31-32.

## VIII.  CLAIM CONSTRUCTION

Claim terms of a patent in IPR are given their "ordinary and customary meaning as understood by [a POSITA] and the prosecution history pertaining to the patent."  *See* 37 C.F.R. § 42.100(b); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005).  For purposes of this Petition, no specific claim construction (beyond plain and ordinary meaning) is necessary.

## IX.  GROUNDS OF UNPATENTABILITY

Pursuant to Rule 42.104(b)(4)–(5), the sections below demonstrate how the prior art discloses each and every limitation of the Challenged Claims, and how those claims are rendered obvious by the prior art with knowledge of a POSITA.  Mr. Jestice, a qualified POSITA, provided a declaration (Ex. 1002), reinforcing these analyses and supporting these conclusions.

### A. Ground I:  Claims 1, 3, 5-7, 9, and 11-12 are obvious over Lawlor in view of Bouve, De Leo, and Looney.

#### 1.  Claim 1

##### (a)  *Preamble: A method for constructing a unified electronic banking environment, said method comprising the steps of:*

To the extent it is deemed limiting, Lawlor discloses, or renders obvious, the preamble.  *See* Ex. 1004, Fig. 1; Ex. 1002, ¶¶79-82.

15

Specifically, Lawlor recognizes that banking networks are no longer limited to traditional brick and mortar locations. *See* Ex. 1004, 6:15-33; Ex. 1002, ¶79. Lawlor discloses adding a financial services distribution system (the claimed *unified electronic banking environment*) and the components involved in *constructing* one. *See* Ex. 1004, 17:18-18:23; Ex. 1002, ¶¶79-82.

Lawlor also describes the subsequent steps of claim 1 as detailed in the following sections. Ex. 1002, ¶81. Accordingly, Lawlor discloses, or renders obvious the preamble of claim 1.

> **(b)    *Element [1.A]: providing at least one common multi-channel server coupled to more than one e-banking touch points and also coupled to at least one computer system configured with at least one control console, said more than one e-banking touch points and said at least one computer system being provided in locations remote from the other;***

Lawlor discloses, or renders obvious, this limitation alone or in view of Bouve. Ex. 1002, ¶¶84-103.

As illustrated below in an annotated version of Lawlor's Figure 1, Lawlor discloses a central computer 52[1] (highlighted in red), corresponding to *at least one common multi-channel server* to which the *more than one e-banking touch points* (highlighted in yellow) connect. *See* Ex. 1004, Fig. 1; 17:29-33, 19:7-12; Ex. 1002, ¶86. Lawlor's central computer 52 (red) is also *coupled to….at least one computer system configured with at least one control console*, which resides with the member banks 64 and bank 74 (blue) and/or with the operator of the Lawlor's central computer 52. *See* Ex. 1004, Fig. 1, 18:11-54; Ex. 1002, ¶¶86-87. The connections to Lawlor's central computer 52 are in green.

---

[1] Lawlor interchangeably refers to element 52 as a "fault tolerance computer system" and a "central computer" throughout the written description. For consistency, the Petition refers to element 52 as a "central computer."

U.S. PATENT 8,862,508
Petition for *Inter Partes* Review



*FIG. 1*

Lawlor's central computer 52 is a *server* because it is a computer connected through a network to other computers and devices where it provides functionality and services to those other devices. *See* Ex. 1002, ¶88. As an example, Lawlor's central computer 52 provides "various billpaying and other financial functions and to distribute billpaying and other services to remote terminals 54 on demand." *See* Ex. 1004, 19:7-12; Ex. 1002, ¶88. Lawlor's central computer 52 also provides transactional functionality to the member bank systems. *See id.*, 18:11-54, 19:63-20:10; Ex. 1002, ¶88.

Lawlor's central computer 52 is a *common multi-channel server* because it can communicate over a variety of channels. *See* Ex. 1002, ¶89. The '508 patent

discloses a multi-channel server as a traditional server used in a traditional client-server environment that delivers data through multiple different channels.  *See* Ex. 1001, 2:18-20, 3:23-64; Ex. 1002, ¶53.  Similarly, Lawlor's central computer 52 has a channel for each of the multiple remote terminals 54 over a digit packet network switch 56.  *See* Ex. 1004, Fig. 1,17:29-33; Ex. 1002, ¶89.  Lawlor's central computer 52 also contains multiple channels for communication with the member banks, including a channel using dial-up and another using the ATM interchange 66.  *See* Ex. 1004, Fig. 1, 18:11-54, 19:63-20:10; Ex. 1002, ¶89.

Lawlor's remote terminals are *e-banking touch points* because they are electronic devices that perform banking functionality through user input.  Ex. 1002, ¶90.  For example, the remote terminals allow a user to perform functions such as "paying bills electronically from their home."  *See* Ex. 1004, 22:45-46; 19:8-12.  As such, the user is capable of interacting with Lawlor's remote terminals "to carry out a transaction with their financial institution."  Ex. 1001, 4:48-51.

A POSITA would have understood from Lawlor's disclosure that Lawlor's central computer 52 is *coupled to at least one computer system configured with at least one control console*.  Ex. 1002, ¶¶86-87.  As an example of the *coupling*, Lawlor states that users of the remote terminals may designate payments to take place at a later time, which the internal bank systems will necessarily have to process.  *See* Ex. 1004, 42:47-43:9; Ex. 1002, ¶¶86-87.

As another example, Lawlor collects user information via mailing or telephone. *See id.* at 41:25-41. This information is stored in database 84 so that it can later be used to target advertisements to potential customers. *See* Ex. 1004*,* 39:25-44; Ex. 1002, ¶¶86-87. Thus, this information must be entered into Lawlor's database using *a computer system configured with a control console* for data entry. This is further confirmed by the fact that the '508 Patent describes that banks, or other parties, manage a server through "a common set of control consoles," *See* Ex. 1001, 1:53-67; Ex. 1002, ¶53. The '508 Patent describes "a marketing computer system 108 and an operations computer system 110," which are computers that allow marketing and IT personnel, respectively, to manage the system of the '508 patent. *See* Ex. 1004, 3:42-62; Ex. 1002, ¶53. Therefore, a POSITA would have understood that to enter the customer information into database 84 and provide customer service—such as correcting improperly entered future payments—the bank and/or third party managing central computer 52 must be *coupled to at least one computer system configured with at least one control console* in order to interact and edit database 84 as required. Ex. 1002, ¶¶86-87.

Further, a POSITA would have understood that *said more than one e-banking touch points and said at least one computer system being provided in locations remote from the other* because Lawlor's remote terminals are designed to be "located in users' homes, offices or other locations." *See* Ex. 1004, 1:15-17; Ex. 1002, ¶91.

That is, Lawlor's remote terminals (the *more than one e-banking touch points*) are designed to be remote from Lawlor's central computer 52, the member banks 64, and any computer systems associated therewith. *See* Ex. 1002, ¶91. This is further highlighted by the fact that Lawlor's remote terminals are connected via dial-up instead of a local hardwire connection such as Ethernet and that Lawlor refers to them as ***remote*** terminals. *See* Ex. 1002, ¶91.

To the extent Lawlor does not render obvious *at least one computer system configured with at least one control console*, Bouve does. *See* Ex. 1002, ¶92.

Bouve discloses that operators need to "add and modify the information within [a] database." *See* Ex. 1006, 5:39-52; Ex. 1002, ¶93. This can be done using a "controller" (a *computer system*) that "preferably includes a display 40 and a keyboard 40" (a *control console*) and "through control of a system operator typing commands at the keyboard 42." Ex. 1002, ¶93.

Therefore, Lawlor, in view of Bouve, renders element [1.A] obvious.

### (i) A POSITA Would Have Been Motivated to Apply the Teachings of Bouve to Lawlor

A POSITA would have applied Bouve's well known teaching of a control point to Lawlor's system for operator management of the system.. Ex. 1002, ¶94. Bouve is directed to using and managing large scale and changing databases, where users and data managers are not part of the same entity. *See* Ex. 1006, Abstract, 5:39-52; Ex. 1002, ¶95. Lawlor and the '508 Patent also require management of

21

such databases.    Specifically, Lawlor requires the use of a *computer system configured with at least one control console* in order to edit and manage its own databases.    Lawlor does not expressly state well-known approaches to manage a database because it presumes they are within the POSITA's knowledge.    Ex. 1002, ¶95.    Thus, Lawlor suggests the combination of its system with other known database management systems, such as Bouve.    *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 419 (2007).

A POSITA would have been motivated to apply Bouve's operator controlled computer to realize Lawlor's stated goal of storing customer information in a database to later use for targeted advertisements and to facilitate customer support for remote e-banking transactions.    Ex. 1002, ¶96.    Operators using a computer system with control consoles, as described in Bouve, was and remains a common method to manage and update databases to ensure data therein remains current.    Ex. 1002, ¶97.    Applying Bouve's teachings to Lawlor's system would merely be a basic step to ensure Lawlor's system would function as described.    Ex. 1002, ¶98.

Bouve demonstrates a well-known technique for managing a database that would improve Lawlor's system in the same manner.    Ex. 1002, ¶¶99-100.    Further, adding Bouve's computer system and control console to Lawlor would be applying well-known teachings from the prior art to attain the predictable result; namely,

managing Lawlor's database as Lawlor expressly intends or would otherwise need to provide Lawlor's intended functionality. *See id*.

Thus, a POSITA would have understood that applying Bouve's known techniques to Lawlor's known system would achieve the predictable result of both managing a database as Lawlor describes and providing the customer support required by systems such as Lawlor. *See id.* Moreover, a POSITA would have understood that using Lawlor's teachings of a computer system with a control console would have been taking known techniques to improve Lawlor's in the same way (using a computer system with a control console to manage a crucial database). *See id*.

### (ii)    A POSITA would have had a Reasonable Expectation of Success

A POSITA would have had a reasonable expectation of success that the combination of Bouve with Lawlor would yield Element [1.A], because Bouve provides the tools, *at least one computer system configured with at least one control console,* that would be required to manage databases such as those employed in Lawlor. *See* Ex. 1004, 41:25-41, 39:25-44; Ex. 1006, Abstract, 5:39-52; Ex. 1002, ¶¶101-103.

Adding Bouve's operator-controlled *at least one computer system configured with at least one control console* requires little, if any, significant modification of Lawlor. Ex. 1002, ¶¶101-103. In fact, Lawlor leaves open which technique to use

to maintain its database. *See id.* Therefore, the combination would have yielded predictable results of a database accessible to the service provider (banks), storing user data for targeted advertisements, and pending consumer banking transactions, as reasonably expected by a POSITA. *See id.*

> **(c)** **Element [1.B]: and further wherein said more than one plurality of e-banking touch points are comprised of at least two different types of e-banking touch point devices, each of which comprise one or more of an automatic teller/transaction machine (ATM), a self service coin counter (SSCC), a kiosk, a digital signage display, an online accessible banking website, a personal digital assistant (PDA), a personal computer (PC), a laptop, a wireless device, or a combination of two or more thereof, and wherein at least one of said e-banking touch points is in communication with one or more financial institutions through said multi-channel server;**

Lawlor alone, or in view of De Leo, discloses, or renders obvious, Element [1.B]. Ex. 1002, ¶104.

Lawlor includes a plurality of remote terminals that correspond to *e-banking touch points*. *See supra* Section IX.A.1(b); Ex. 1002, ¶105. Lawlor's Figures 3 and 4, reproduced below, show terminals 54 "available in two different types: a model which contains data entry and voice telephone capability (including a telephone handset 100 and associated telephone electronics); and a smaller, pocket-size version (shown in FIG. 4) that contains no telephone voice capability." Ex. 1004, 23:14-20.

Thus, Lawlor describes at least *two different types of e-banking touch point devices*. Ex. 1002, ¶106.



Two potential examples of remote terminals disclosed in Lawlor include a telephone with an LCD screen or a pocket-size device with an LCD display—distinct devices allowing for the digital visual display of information. Ex. 1004, 23:14-20, 23:34-37. These two exemplary devices can communicate with the member banks through Lawlor's central computer 52. Ex. 1002, ¶¶107-108. That is, Lawlor discloses *two different types of e-banking touch point devices* and *each of which comprise one or more of an… digital signage display,… a personal digital assistant (PDA)*. *Id.*

Further, Lawlor's remote terminals 54 (yellow) (*at least one of said e-banking touch points*) are *in communication with one or more* member banks (blue) (*financial institutions*) through Lawlor's central computer 52 (red) (*said multi-channel server*). *See supra* Section IX.A.1.(b).

U.S. PATENT 8,862,508
Petition for *Inter Partes* Review



*FIG. 1*

As explained in Lawlor and depicted above, Lawlor's system includes communication between users at remote terminals 54 and the banks (64, 74) in order to allow them to pay bills and perform other home banking activities. *See* Ex. 1004, 23:45-44; Ex. 1002, ¶¶108-110.

To the extent it is argued that Lawlor's remote terminals are not *two different types of e-banking touch point devices* within the meaning of this element, De Leo further discloses *two different types of e-banking touch point devices*. *See* Ex. 1002, ¶111.

De Leo discloses:

26

> While an example will be disclosed in conjunction with **ATM 202** [*an automatic teller/transaction machine (ATM)*], the user could access similar information using other channel devices such as a **handheld personal digital assistant 240** [*a personal digital assistant (PDA)*] running Windows CE, Palm OS, or other operating system and having a wireless (such as cellular or packet radio) or...other **terminals such as WEB TV 242, dedicated kiosks, debit card terminals, point of sale terminals devices 244, or other such terminals** [*kiosk*] may be used in addition to ATM 202.

Ex. 1005, [0082] (emphasis added). That is, De Leo, which also describes targeted advertisements for ATMs and home banking, discloses e-banking touch points that include *an automatic teller/transaction machine (ATM)*, *a kiosk*, and *a personal digital assistant (PDA)*. *See* Ex. 1005, [0082], [0090]; Ex. 1002, ¶¶112-114.

For the reasons above, Lawlor alone, or in combination with De Leo, discloses, or renders obvious, Element [1.B]. Ex. 1002, ¶¶101-115.

### (i)    A POSITA Would Have Been Motivated to Apply the Teachings of De Leo to Lawlor

A POSITA would have been motivated to apply the teachings of De Leo, which is also analogous art in the field of providing target advertisement to banking customers at e-banking touch points, with Lawlor's system. *See* Ex. 1002, ¶116.

Specifically, a POSITA would have been motivated to modify Lawlor's system to include additional and different styles of e-banking touch points. *See id*.

Lawlor provides an explicit teaching, suggestion, and motivation to combine its teachings with De Leo. *KSR*, 550 U.S. at 419 (2007). Lawlor explains that traditional ATMs have limited functionality compared to the many banking services a client requires. *See* Ex. 1004, 4:6-7; Ex. 1002, ¶117. Lawlor envisions a more sophisticated system that allows users to access more functions and to do so from home. *See id.*, 6:34-7:35. Lawlor contemplates using personal computers for the same purposes. *Id.* Accordingly, a POSITA would have been motivated to look to the teachings of De Leo, which discloses such computing devices with increased capabilities. For example, De Leo discloses additional touch points such as ATMs, handheld personal digital assistants, kiosks, debit card terminals, and point of sale terminal devices, among others. *See* Ex. 1005, [0082]. It further demonstrates that sending targeted advertisements to e-banking consumers when they are using ATMs or other devices is important. *See id.*, [0090].

Thus, a POSITA would have used De Leo's well-known and commonly used e-banking touch points, such as PDAs and remote kiosks in Lawlor's system to further achieve the goals stated in Lawlor. *See* Ex. 1002, ¶119. A POSITA would have understood this to be the natural extension of Lawlor's system that expands Lawlor's user base and thereby potential recipients of target advertisements by

providing the ability to send those target advertisements across a wider variety of devices.  *See* Ex. 1002, ¶120.

A POSITA would have understood that applying De Leo's known techniques to Lawlor's system would achieve the predictable result of a more modern and farther-reaching version of Lawlor's system while still maintaining the advantages of its targeted ad delivery.  *See id.*, ¶121.  In particular, implementing the De Leo touch points—for example, either handheld PDAs or dedicated kiosks—would have expanded the reach of Lawlor's system by increasing userbase at the time of De Leo when more people had personal devices and by increasing access to the system by providing more access locations.  *See id.*, ¶119.  Moreover, a POSITA would have understood that implementing De Leo's teachings would have been using known techniques to improve Lawlor's System by expanding the possible locations and users to which targeted ads may be delivered.  *See id.*, ¶¶119-121.

### (ii)    A POSITA Would Have Had a Reasonable Expectation of Success

A POSITA would have had a reasonable expectation of success in combining De Leo with Lawlor.  *See* Ex. 1002, ¶¶122-123.  A POSITA would have found it straight-forward to enhance Lawlor's remote terminals with De Leo's e-banking touch points because the techniques for doing so were common, and well known.  *Id.*, ¶122.

Since implementing De Leo's e-banking touch points would not require any significant changes to Lawlor's server or communication channels, it would have been straightforward to incorporate De Leo's e-banking touch points. Ex. 1002, ¶¶121-124. A POSITA would have had their reasonable expectation of success reinforced because De Leo discloses that its e-banking touch points are also designed to facilitate e-banking and receive target advertisements. *See* Ex. 1005, [0023]-[0024], [0043], [0078]. Lawlor's system relies upon its central computer as the sole intermediary interface between the touch points, the rest of the banking infrastructure, and neither Lawlor's remote terminals nor De Leo's e-banking touch points rely on proprietary communication systems; therefore, implementing the De Leo touch points in lieu of the Lawlor remote terminals would have involved little to no modification. Ex. 1002, ¶122. Thus, implementing De Leo's e-banking touchpoints into Lawlor would have yielded the predictable result of expanding the types of remote terminals Lawlor could work with—thus, expanding the reach of Lawlor's system in terms of location and users. Ex. 1002, ¶¶121-124.

**(d)    *Element [1.C]: receiving an actionable input from at least one e-banking touch point***

Lawlor, discloses, or renders obvious, Element [1.C]. Ex. 1002, ¶¶125-128.

Lawlor explains that consumers can use their remote terminals (*at least one e-banking touch point*) to "gain access to services by <u>identifying their account</u> from a menu of authorized household users, <u>then entering their bank ATM personal</u>

30

identification number (PIN)." *See* Ex. 1004, 8:6-13 (emphasis added). Here, a user's PIN and account number each represent *an actionable input* because they use an input upon which Lawlor's system takes further action, such as local processing or sending to the user's bank verification system. *See* Ex. 1002, ¶¶126-127.

In particular, "[u]ser account number and PIN values are transmitted to the user's bank (over the ATM network 66 in the preferred embodiment) for verification. When the authorization module 80D receives verification from the bank the user is cleared for transactions." Ex. 1004, 19:63-20:3. That is, a user enters their account number and PIN (*input*) at a remote terminal (*at least one e-banking touch point*) which is then *receiv*[ed] by Lawlor's central computer 52 where it takes action on the input (*actionable input*) by either processing the information or sending the input to the bank's system for verification. Ex. 1002, ¶¶126-127.

Accordingly, Lawlor, discloses or renders obvious Element [1.C]. Ex. 1002, ¶¶125-128.

>
> **(e)     *Element [1.D]: retrieving previously stored data associated with said actionable input, wherein said previously stored data is accessible to any one of said e-banking touch points, and said previously stored data comprises data from one or more financial institutions and one or more user-defined preferences;***

Lawlor discloses, or renders obvious, this limitation. *See* Ex. 1002, ¶129.

Users can access e-banking services by entering their account and PIN numbers into one of Lawlor's remote terminals. *See supra* Section IX.A.1(d). This information is retrieved (from the bank and/or other third-party service providers) when users use the system's e-banking services. *See id.*, ¶¶130-136.

One example of this type of interaction is provided by Lawlor's "pay bill" feature. Ex. 1002, ¶131. According to Lawlor, as part of "pay bill," "bill process routine 392 may provide account balance information to the user by forming a standard account balance ATM…containing the user's account number and PIN and transmitting this request over the ATM network to the user's bank." *See* Ex. 1004, 40:32-42. Therefore, in response to the user's account number and PIN (*actionable input*), Lawlor's system retrieves account balance information (*previously stored data*). Ex. 1002, ¶¶131-132. Account balance information is *data from one or more financial institutions* because Lawlor's system "receiv[es] the user's account balance from the user's bank." *See* Ex. 1004, 40:32-42; Ex. 1002, ¶131.

However, this is not the only information retrieved by Lawlor's system that is associated with the user's *actionable input*. *See* Ex. 1002, ¶¶132-134.

Rather, as part of "pay bill," "central computer 52 may control display terminal 54 to display a prompt or other information (e.g., a prescheduled amount or information regarding the last payment made to this particular payee)." *See id.,*

Ex. 1004, 42:24-27.[2]  "[A] prescheduled amount or information regarding the last payment made to this particular payee" are examples of *one or more user-defined preferences*.  *See id.*

This is confirmed by the '508 Patent itself, because dependent claim 3 recites "wherein said user-defined preferences comprise one or more of a customer name… an account for conducting transactions, and a monetary amount to be the subject of select transactions."  Ex. 1001, cl. 3; Ex. 1002, ¶¶132-134.  Further, Lawlor explains that the aforementioned information is *user-defined preferences* because users define this information, such as their bill pay preferences, either in response to phone calls or direct mailing.  *See* Ex. 1004, 41:25-43 (examples of preferences collected from users), 50:59 (examples of user preferences that can be sent to advertisers); Ex. 1002, ¶¶132-134.

Lawlor provides other examples of user-defined preferences.  Lawlor explains "the user database stored on mass storage device 84 includes demographic and other information about each user," which is later used to provide targeted advertisements to users.  *See* Ex. 1004, 39:28-32; Ex. 1002, ¶134.

---

[2] Lawlor interchangeably refers to remote terminal 54 as display terminal 54.

U.S. PATENT 8,862,508
Petition for *Inter Partes* Review

A POSITA would have further understood that Lawlor's disclosure applies to any remote terminal. *See*, *e.g.*, Ex. 1002, ¶135. Lawlor expressly intends for remote terminals to exist "in users' homes, offices or other locations." *See* Ex. 1004, 1:3-22. Thus, a POSITA would have understood that the foregoing information is accessible by *any one of said* remote terminals (*e-banking touch points*). Ex. 1002, ¶135.

Accordingly, Lawlor discloses, or renders obvious, Element [1.D].

> **(f)    *Element [1.E]: delivering said retrieved data to said at least one e-banking touch point transmitting said actionable input;***

Lawlor discloses, or renders obvious, Element [1.E]. Ex. 1002, ¶¶137-142.

As explained above, Lawlor retrieves *previously stored data*, which is the *retrieved data*. *See* Ex. 1002, ¶138. The *retrieved data* is further delivered to Lawlor's remote terminal that transmitted the user's account number and PIN (*said at least one e-banking touch point transmitting said actionable input*). Ex. 1002, ¶140.

For example, with respect to a user's account balance, Lawlor's central computer 52 "reformat[s] this received account balance information; and transmit[s] the account balance to the remote terminal 54." *See* Ex. 1004, 40:32-42. Likewise, for a user's prescheduled amount or information regarding the last payment made to this particular payee, "central computer 52 may control display terminal 54 to

display a prompt or other information (e.g., a prescheduled amount or information regarding the last payment made to this particular payee)." *See id.*, 42:24-27.

That is, Lawlor's central computer 52 first retrieves previously stored data (as claimed in element [1.D.]) and then delivers that same data to the remote terminal 54 that transmitted the user's account and PIN numbers. Ex. 1002, ¶¶139-141.

Accordingly, Lawlor discloses, or renders obvious, Element [1.E].

> ### (g) Element [1.F1]: storing transactional usage data associated with said at least one e-banking touch point transmitting said actionable input,

Lawlor alone, or combined with Bouve, discloses, or renders obvious, Element [1.F1]. Ex. 1002, ¶143.

Lawlor's remote terminals 54 (upon sending an account and PIN number) allow users to schedule payments that are due the same day or months into the future and "central computer 52 logs the payment in its output file, which it will add to a scheduled transaction log so that the payment will automatically be processed on the appropriate day." *See* Ex. 1004, 42:47-43:9. Further, each session is uniquely tracked. *See id.*, 34:31-34. Therefore, Lawlor stores *transactional usage data associated with said at least one e-banking touch point transmitting said actionable input. See* Ex. 1002, ¶145.

Maintaining this information "permits a terminal user to review and correct the amount, date or payee for the current session or for future dated transactions."

Ex. 1004, 33:33-35.  As explained with respect to element [1.D], a POSITA would have understood that a user can access Lawlor's e-banking services, including this service allowing users to manage scheduling of payments, through any remote terminal.  *See* Ex. 1002, ¶146, *supra* Section IX.1.A(d).  Thus, for the foregoing disclosure, a POSITA would have understood that Lawlor discloses *said stored transactional usage data is accessible by any one of said more than one e-banking touch points*.  *See* Ex. 1002, ¶146.  Accordingly, Lawlor discloses, or renders obvious, Element [1.F1].

> **(h)    *Element [1.F2]: wherein said stored transactional usage data is accessible by any one of said more than one e-banking touch points and said at least one computer system***

Lawlor alone, or combined with Bouve, discloses, or renders obvious, Element [1.F2].  Ex. 1002, ¶143.

A POSITA reading Lawlor would have understood that Lawlor discloses *wherein said stored transactional usage data is accessible by… said at least one computer system*.  Ex. 1002, ¶147.  Lawlor explains "module 80H maintains customer database files, vendor files and transaction files," which allow for "marketing information analysis, accounting/audit trails, and customer service reports."  *See* Ex. 1004, 20:32-35.  Additionally, each session is uniquely tracked "for customer servicing and reference."  *See id.*, 34:31-34.  A POSITA would have understood that to facilitate customer service and data analytics, the transactional

data must be accessible beyond Lawlor's remote terminals (i.e., Lawlor's remote, user facing, terminals cannot be the sole mode of access of the transactional data). *See* Ex. 1002, ¶147.  Customer service representatives and data analysts would need to access the database files.  *See id.*  A POSITA would have understood that one well-known way for such customer service representatives and data analysts to access these files would have been by using *at least one computer system*. *See id*.

Accordingly, Lawlor discloses, or renders obvious, Element [1.F2].

To the extent that Lawlor does not expressly or inherently disclose Element [1.F2], a POSITA would have found it obvious to allow Lawlor's *stored transactional usage data* to be *accessible…*[from] *said at least one computer system*, as taught by Bouve.  Ex. 1002, ¶148.

As explained with respect to Element [1.A], Bouve describes that system operators, which can include customer service specialists or data analysts, can access and modify databases using conventional computer systems with keyboards and displays.  *See* Ex. 1006, 5:39-52.  When used in conjunction with Lawlor's system, operators could access the "transaction files" stored with Lawlor's system to carry out the "marketing information analysis, accounting/audit trails, and customer service reports" as Lawlor describes.  *See* Ex. 1004., 20:32-35.  *See* Ex. 1002, ¶147.

Accordingly, Lawlor, in combination with Bouve, discloses or renders obvious Element [1.F2].  Ex. 1002, ¶149.

### (i)    A POSITA Would Have Been Motivated to Apply the Teachings of Bouve and Lawlor

A POSITA would have been motivated to combine the teachings of Bouve's analogous art (*see supra* SectionIX.A.1(b)(i)) with that of the Lawlor system.

A POSITA would have been motivated to incorporate Bouve's operator controlled computer system into Lawlor's broader system. With such incorporation, operators would be able to access "transaction files" stored with Lawlor's system to provide the "marketing information analysis, accounting/audit trails, and customer service reports" on the information stored and maintained in the Lawlor system. Ex. 1002, ¶150.

A POSITA would have been further motivated to rely on Bouve's operator controlled computer system because Lawlor acknowledges that errors stored in transactions are modifiable. Ex. 1004, 33:33-35. A POSITA would have understood that customers may not always be at their remote terminals or that remote terminals may experience errors. Therefore, a POSITA would have been motivated to employ Bouve's computer system in Lawlor's system to allow customer service specialists to assist users of Lawlor's system. Ex. 1002, ¶151.

Thus, applying Bouve's teaching of well-known computer systems that facilitate database management would improve Lawlor's system by allowing customer service specialists to access the transaction data Lawlor stores to aid

consumers and other operators in marketing information analysis and accounting/audit trails.  Ex. 1002, ¶151.

### (ii)   A POSITA Would Have Had a Reasonable Expectation of Success

A POSITA would have had a reasonable expectation of success that the combination of Lawlor and Bouve would yield Elements [1.F1-2] for the same reasons described with respect to Element [1.A].  *See supra* Section IX.A.1(a)(i).  Ex. 1002, ¶152.

### (i)   *Element [1.G]: monitoring via said server an active session in real-time for selection of targeted marketing content correlated to said user-defined preferences;*

Lawlor alone, or in view of De Leo, discloses, or renders obvious, Element [1.G].

Lawlor provides an example of an *active session* as illustrated in Fig. 10 (reproduced below).  *See* Ex. 1002, ¶¶155-156.



The session is an *active session* at least because the process shown in Fig. 10 only occurs when the user is actively using the remote terminal. *See id*. The *active session* begins with the user signing on (step 306) and ends after the user returns to the process of Fig. 9 (step 386). *See id.* As part of the active session, "[a]s the user depresses keys to keypad 114 indicating his PIN number, central computer accumulates the digits and calculates the received number" and "if the inputted number is valid, central computer 52 transmits advertising or messaging text to remote terminal 54." Ex. 1004, 39:5-7, 39:25-27.

First, from this disclosure, a POSITA would have understood that Lawlor's system is *monitoring via said server an active session in real-time. See* Ex. 1002, ¶¶155-156. In particular, Lawlor's central computer 52 receives the user's input and

then determines if it is correct. *See id.*, Ex. 1004, 39:5-7, 39:25-27. The central computer 52 only takes further action if the user has entered the correct information and prompts the user to reenter data if it is wrong. *See* Ex. 1004, 39:21-27; Ex. 1002, ¶¶155-156. Accordingly, a POSITA would have understood Lawlor's central computer 52 (*said server*) to monitor the user's *active session in real-time*. *See* Ex. 1002, ¶¶155-156.

Second, a POSITA would have also understood that Lawlor's central computer 52 (*said server*) is *monitoring*. *See id*. In particular, the central computer 52 (*said server*) waits until the user has entered the correct PIN before selecting and transmitting an advertisement to a user. *See* Ex. 1004, 39:25-27. Accordingly, part of the monitoring Lawlor's central computer 52 performs includes *monitoring… for selection of targeted marketing content*. *See* Ex. 1002, ¶¶155-156.

Further, Lawler's transmitted advertisement (*targeted marketing content*) is *correlated to said user-defined preferences*. *See* Ex. 1002, ¶157. In particular, Lawlor explains that "this advertising text [is] preferably being targeted to a specific user or user group." Ex. 1004, 39:27-28. In more detail, "the user database stored on mass storage device 84 includes demographic and other information about each user, and central computer 52 may be appropriately programmed to transmit different advertising text to different users." *Id.*, 39:28-32. As a non-limiting example, Lawlor explains that "all users having a bank account with a particular

bank and who owned homes… may be sent advertising text pertaining to home equity loans, while users renting apartments… may be sent advertising pertaining to personal loans or automobile loans instead." *Id.*, 39:25-44.

Thus, Lawlor's central computer 52 correlates demographic, user-defined payment information, and other information about each user (*said user-defined preferences,* as explained in 1.D above) in order to select the appropriate advertisement to send to a user (*targeted marketing content*). Ex. 1002, ¶¶158-159.

Accordingly, Lawlor discloses or renders Element [1.G] obvious.

To the extent it is argued Lawlor does not disclose or render obvious *targeted marketing content* is *correlated to said user-defined preferences,* De Leo does. Ex. 1002, ¶¶160-164.

De Leo describes that "[a]nother goal is to have the ability to target the delivery of information based on stored user profiles, tracked user behavior, instantaneous user reaction, and/or stored demographics across different channels." Ex. 1005, [0091]. Like Lawlor, De Leo believes "favored transaction[s]" are one option for *user-defined preferences. See id.* However, De Leo describes numerous other possibilities such as "stock quotes, horoscope, or other information the user chose to receive when setting up the personal preference list." *Id.*

The user's personal preference list (*said user-defined preferences*) is used to select targeted advertisements for a user. For example, "an ad for the particular fast

food company may be displayed based on the information stored in personal preference list 228." *Id.*, [0111].

Accordingly, Lawlor alone or in combination with De Leo renders Element [1.G] obvious.

### (i)    A POSITA Would Have Been Motivated to Apply the Teachings of De Leo to Lawlor

A POSITA would have been motivated to combine the teachings of De Leo, which is also analogous art in the field of providing target advertisements to banking customers at e-banking touch points, with Lawlor's system. *See* Ex. 1002, ¶165.

Specifically, a POSITA would have been motivated to modify Lawlor's system to include De Leo's specific examples of use-related data that can shape targeted advertisements. *See id.*, ¶166.

Lawlor explains that distributing a targeted advertisement is an express goal of Lawlor's system. *See* Ex. 1004, 39:25-44. Further, Lawlor acknowledges that a wide variety of information can be used for a target advertisement including a catch-all of "other information." *Id.*, 39:28-32.

De Leo provides examples of how to use both the *user-defined preferences* described in Lawlor, but also provides examples of what would be included in Lawlor's "other information" that Lawlor's uses to better target its advertisements. *See* Ex. 1002, ¶¶166-170. De Leo also provides specific examples about how other

*user-defined preferences* can be used to send specific targeted advertisements. *See id.*

Thus, a POSITA would have used De Leo's well-known preference list, in place of or in addition to Lawlor's "demographic and other information," to improve the nature and quality of Lawlor's targeted advertisements. *See id.* A POSITA would have understood this to be is the natural extension of Lawlor's system and within the "other information" Lawlor contemplates. *See id.*, ¶169.

A POSITA would have understood that applying De Leo's known techniques to Lawlor's system would achieve the predictable result of providing more targeted advertisements accounting for more user-defined preferences. Ex. 1002, ¶170. Moreover, a POSITA would have understood that using the De Leo's teachings would have been taking known techniques to improve Lawlor's system by expanding the number of user-defined preferences that are known to provide better targeted advertisements. *Id.*

### (ii)    A POSITA Would Have Had a Reasonable Expectation of Success

A POSITA would have had a reasonable expectation of success in combining De Leo with Lawlor as described above. *See* Ex. 1002, ¶171. A POSITA would have found it straightforward to replace or augment Lawlor's "demographic and other information" with De Leo's e-banking preference list because the techniques for doing so were common and well known. Ex. 1002, ¶171 (explaining that the

44

only modification to Lawlor would be the addition of extra data, which would not require design changes to Lawlor's system).

Since implementing De Leo's preference list would not require any significant changes to Lawlor's system, it would have been straightforward to incorporate De Leo's preference list because it would have involved no significant modification to Lawlor. Ex. 1002, ¶171. Implementing De Leo's preference list into Lawlor would have yielded the predictable result of improving the quality of Lawlor's targeted advertisements, thus improving one of Lawlor's principle objectives. Ex. 1002, ¶¶170-171.

  **(j)**  ***Element [1.H]: subsequent to said monitoring, selecting in real-time said targeted marketing content correlated to said user-defined preferences; and***

Lawlor alone, or in view of Looney, discloses, or renders obvious, Element [1.H].

As explained regarding Element [1.G], Lawlor selects and transmits *targeted marketing content correlated to said user-defined preferences*. *See supra* Section IX.A.1(h). A POSITA would have understood Lawlor only does so *subsequent to said monitoring*, because Lawlor describes that "central computer 52 transmits advertising or messaging text to remote terminal 54" only if it detects a valid input from the user (and not before). Ex. 1004, 39:5-7, 39:25-27. Thus, a POSITA would have understood that Lawlor discloses *subsequent to said monitoring, selecting in*

*real-time said targeted marketing content correlated to said user-defined preferences*. *See* Ex. 1002, ¶¶174-176.

However, to the extent that it is argued that Lawlor does not disclose *selecting in real-time,* Looney does. *See id.*, ¶¶174-77.

Looney describes that "the real-time advertisement targeting engine 246 identifies and selects a personalized advertising message to be targeted to an individual that will have customer-specific information and content." Ex. 1007, 8:60-64.  Looney understands that user preferences regularly change and targeted advertisements can be augmented with real-time consumer information.  Ex. 1007, 9:2-7, 9:27-30.  Further, Looney recognizes that "active advertising campaign may have multiple advertising messages or multiple formats of a single advertising message."  Ex. 1007, 9:31-35.  Moreover, Looney expressly considers real-time information, like "current inventory levels of a good, [and] availability to provide a service" before selecting a targeted advertisement.  *See* Ex. 1007, 9:41-46.  Thus, Looney teaches that *selecting ... said targeted marketing content correlated to said user-defined preferences* should be based on real-time concerns and information. *See* Ex. 1002, ¶¶177-184.  Accordingly, Looney describes *selecting in real-time said targeted marketing content correlated to said user-defined preferences*.  *See id.*, ¶183.

U.S. PATENT 8,862,508
Petition for *Inter Partes* Review

Thus, Lawlor, alone or in combination with Looney, renders Element [1.H] obvious. *See id.*, ¶184.

### (i)    A POSITA Would Have Been Motivated to Apply the Teachings of Looney to Lawlor

A POSITA would have been motivated to combine the teachings of Looney, which is also analogous art in the field of providing target advertisement across different touch points, with Lawlor's system. Specifically, a POSITA would have been motivated to modify Lawlor's system to include Looney's more proactive and targeted advertisements. Ex. 1002, ¶185.

Lawlor explains that distributing a target advertisement is an express goal of Lawlor's system. *See* Ex. 1004, 39:25-44. Further, Lawlor acknowledges that a wide variety of information can be used for target advertisement including a catch-all of "other information." *See id.*, 39:28-32.

Looney leverages the same type of information Lawlor uses for its advertisements. Yet, Looney goes further by leveraging real-time data to select advertisements in real time, allowing Looney to increase the return on investment per advertisement. Ex. 1002, ¶¶185-188. A POSITA would have been motivated to include these aspects from Looney into Lawlor to create an improved system capable of delivering more targeted advertisements. *See id.*, ¶188.

Further, a POSITA would have been further motivated to combine Looney's technique with Lawlor if Lawlor were also combined with De Leo's e-banking touch

points. *See id.*, ¶189. Like De Leo, Looney contemplates a wide variety of possible displays—including displays that feedback real-time information about users and their habits. Thus, a POSITA would be motivated to use Looney's technique for real-time advertisement selection to increase the benefits afforded by De Leo's e-banking touch points. *See id.*

A POSITA would have used Looney's well-known real-time advertisement selection to improve the nature and quality of Lawlor's targeted advertisement. *See* Ex. 1002, ¶190. Accordingly, a POSITA would have understood this to be the natural extension of Lawlor's system—within the "other information" Lawlor contemplates—that would improve the Lawlor system's return on investment per advertisement. *See id*.

That is, a POSITA would have understood that applying Looney's known techniques to Lawlor's known system would achieve the predictable result of providing more targeted advertisements accounting for more user-defined preferences as well as advertiser's changing concerns and goals. Ex. 1002, ¶191. Moreover, a POSITA would have understood that using the teachings of Looney would have been taking known techniques to improve Lawlor's system in [exactly] the same way (ensuring advertisements were on target and as relevant as possible). *Id.*

### (i)    A POSITA Would Have Had a Reasonable Expectation of Success

A POSITA would have had a reasonable expectation of success in combining Looney with Lawlor as described above.  *See* Ex. 1002, ¶¶192-193.  A POSITA would have found it straightforward to augment Lawlor's selection advertisements with Looney's consideration because the techniques for doing so were common, and well known.  Ex. 1002, ¶192 (explaining that the only modification to Lawlor would be a possible change in time for when an advertisement is selected and the addition of easy to manage rules).

Since implementing Looney's advertisement timing and selection criteria into Lawlor's system would not require any significant changes, it would have been straightforward to incorporate Looney's advertisement timing and selection criteria list.  *See id*.  This incorporation would have yielded the predictable result of improving the quality and return on investment of Lawlor's targeted advertisements, thus improving one of Lawlor's principle objectives.  Ex. 1002, ¶¶192-193.

> **(k)    *Element [1.I]: transmitting in real-time said targeted marketing content during said active session to at least one of said e-banking touch points for acceptance, rejection, or no response by a user, wherein said response by said user is used during said active session to determine whether transmission of additional information related to said marketing content occurs during said active session.***

Lawlor, in view of De Leo, discloses, or at least renders, obvious, Element [1.I].

Lawlor describes that "if the inputted number is valid, central computer 52 transmits advertising or messaging text to remote terminal 54--this advertising text preferably being targeted to a specific user or user group (block 380)." Ex. 1004, 39:25-28. Accordingly, Lawlor transmits a targeted advertisement (*said targeted marketing content*) during an active session, after a user enters their valid PIN (i.e., *in real-time*) to the user's remote terminal (*at least one of said e-banking touch points*). *See* Ex. 1002, ¶196.

Lawlor adds that after a user views the advertisement, "[c]entral computer 52 then preferably sends an additional display screen to remote terminal 54 asking the user whether he wants additional information." *See* Ex. 1004, 39:25-47. If the user selects for more information, Lawlor will allow the advertiser to send the user additional information. *See id.*, 39:55-62. Thus, Lawlor provides the advertisement *for acceptance, rejection, or no response by a user* as part of *determining whether transmission of additional information related to said marketing content occurs during said active session*. *See* Ex. 1002, ¶197.

To the extent Lawlor does not expressly disclose *wherein said response by said user is used during said active session to determine whether transmission of*

*additional information related to said marketing content occurs during said active session*, De Leo does.  *See* Ex. 1002, ¶198.

As discussed above, De Leo provides targeted advertisements (*said targeted marketing content*) to users.  *See id.*, ¶199.  De Leo adds that "an advertisement could be used that required immediate response… If the user reacts positively to the ad, then ATM 202 could dispense a coupon."  Ex. 1005, [0091].  De Leo can also dispense other items in response to a user interacting with an advertisement like "an ad including coupons, tickets, smartcards, gift certificates, etc."  *Id.*  However, De Leo is not limited to dispensing items.  De Leo also describes that "[i]f the user reacts positively to the ad, then ATM 202 could refer the user to the web for follow up information."  *Id.*  The foregoing are examples of *transmission of additional information related to said marketing content*.  Ex. 1002, ¶¶200-201.  Further, because these events happen during a user's interaction with an ATM or e-banking touch point, the *transmission of additional information related to said marketing content occurs during said active session*.  (Emphasis added).  *See* Ex. 1002, ¶201.

Accordingly, Lawlor, in view of De Leo, renders Element [1.H] obvious.

### (i)    A POSITA Would Have Been Motivated to Apply the Teachings of De Leo to Lawlor

A POSITA would have been motivated to combine the teachings of De Leo, which is analogous art in the field of providing targetted advertisement across different touch points, with Lawlor's system.  Specifically, a POSITA would have

been motivated to modify Lawlor's system to include De Leo's more interactive advertisements. Ex. 1002, ¶203.

Lawlor explains that distributing targeted advertisements is an express goal of Lawlor's system. *See* Ex. 1004, 39:25-44. Further, Lawlor understands that consumers may why wish to receive more information regarding the advertisements they view. *See* Ex. 1005, 39:55-62.

However, Lawlor's system requires a separate interaction, whether a phone call or physical mailing. *See* Ex. 1002, ¶204. De Leo describes providing the user instant additional information. *See id.*, ¶205. This reduces the time and hassle for the user to engage with an advertisement, making it more likely that a user would purchase products or use the services advertised through their remote terminal. *See id*. Further, particularly where, as explained regarding Element [1.B], a POSITA would have modified De Leo's Lawlor's remote terminals with De Leo's instantly available additional information to expand the types of promotions and advertisements for targeting users. *See id.* Accordingly, a POSITA would have been motivated to include these aspects of De Leo into Lawlor to create an improved system that engaged users more directly and in real-time while the advertisement was still fresh in their memory. *See id.*, ¶206.

Thus, a POSITA would have used De Leo's well-known real-time transmission of information related to advertisements to improve the nature and

quality of Lawlor's targeted advertisement system. *See id.*, ¶207. A POSITA would have understood this to be a natural extension of Lawlor's system. It removes the time delay between users requesting additional information and their receiving that additional information. As such, the modification to Lawlor's system would further improve the return on investment for each advertisement Lawlor serves. *See id.*

A POSITA would have understood that applying De Leo's known techniques to Lawlor's system would achieve the predictable result of providing a more interactive and direct experience for users, increasing user interaction with advertisements. *See id.* .

### (ii) A POSITA Would Have Had a Reasonable Expectation of Success

A POSITA would have had a reasonable expectation of success in combining De Leo's system with Lawlor's as described above. *See* Ex. 1002. A POSITA would have found it straightforward to replace Lawlor's delayed phone call or direct mailing in response to a user's request for additional information with De Leo's instantaneous approach because the techniques for doing so were common and well-known. Ex. 1002, ¶208.

Implementing De Leo's instantaneous transmission of additional information would rely on the same hardware and mechanisms already in use, so it would have been straightforward to incorporate them into Lawlor's system because it would have involved no significant modification to Lawlor. *See id.* This incorporation

would have yielded the predictable result of improving user interaction with, and return on investment of, Lawlor's targeted advertisements and, thus, improve one of Lawlor's principle objectives.  *See id.*, ¶209.

> **2.    Claim 3: wherein said user-defined preferences comprise one or more of a customer name, a language to be used in connection with one or more of said touch points, an account for conducting transactions, and a monetary amount to be the subject of select transactions.**

Lawlor discloses this limitation, or renders it obvious.

As explained with respect to Element [1.D], Lawlor discloses or renders obvious *said user-defined preferences*.  *See supra* Section IX.A.1(e).

In Lawlor, *said user-defined preferences* include "the names, addresses, account numbers, and other information specifying payees he wishes to pay bills to electronically" and "other relevant account information for other services such as funds transfers."  *See* Ex. 1004, 41:25-41.  Lawlor also receives from the user "a prescheduled amount" that can be selected as part of "pay bill," another example of *said user-defined preferences.  See id.*, 42:24-27.  Thus, Lawlor describes that *said user-defined preferences comprise… an account for conducting transactions, and a monetary amount to be the subject of select transactions.  See* Ex. 1002, ¶¶211-216.

Accordingly, Lawlor discloses or renders obvious Element [3.A].  *See id*.

**3.    Claim 5: wherein said method permits distribution of one or more of advertisements, messages, offers and promotions.**

Lawlor alone, or in combination with De Leo, discloses or renders this limitation obvious.

Lawlor describes that "if the inputted number is valid, central computer 52 transmits *advertising* or messaging text to remote terminal 54." Ex. 1004, 39:25-28 (emphasis added). Thus, Lawlor, as explained regarding Elements [1.G]-[1.I], at least *permits distribution of one or more of advertisements*. *See* Ex. 1002, ¶219.

To the extent it is argued that Lawlor does not disclose this limitation, De Leo does.

De Leo describes, as one of many examples, that "an advertisement could be used that required immediate response… If the user reacts positively to the ad, then ATM 202 could dispense a coupon." Ex. 1005, [0091]. Here, De Leo describes not just an *advertisement* but also *offers and promotions* in the form of a coupon. *See* Ex. 1002, ¶221.

A POSITA would have been motivated to combine De Leo with Lawlor and would have had a reasonable expectation of succeeding in doing so for at least the reasons explained with respect to Element [1.I]. *See supra* Sections IX.A.1(j)(i)-(ii), Ex. 1002, ¶222.

Accordingly, Lawlor in combination with De Leo renders Element [5.A] obvious. *See* Ex. 1002, ¶¶219-222.

**4.    Claim 6: further comprising the step of transmitting additional information related to said marketing content during said active session.**

Lawlor in combination with De Leo renders this limitation obvious.

De Leo describes that "[i]*f the user reacts positively to the ad, then ATM 202 could dispense a coupon.*" Ex. 1005, [0091]. De Leo also dispenses other items such as "*an ad including coupons, tickets, smartcards, gift certificates, etc.*" *Id.* Furthermore, De Leo describes that "[i]f the user reacts positively to the ad, then ATM 202 could refer the user to the web for follow up information." *Id.* Thus, De Leo describes not only the possibility of transmitting additional information but also *transmitting additional information related to said marketing content during said active session*. *See* Ex 1002, ¶¶224-227.

A POSITA would have been motivated to combine De Leo with Lawlor and would have had a reasonable expectation of success for the same reasons discussed regarding Element [1.I]. *See supra* Sections IX.A.1(j)(i)-(ii); Ex. 1002, ¶227.

Accordingly, Lawlor in combination with De Leo renders Element [6.A] obvious. *See* Ex. 1002, ¶¶223-227.

### 5.    Claim 7

**(a)    Preamble: A method for constructing a unified electronic banking environment, said method comprising the steps of:**

Lawlor discloses or renders this element obvious for the same reasons described in Section IX.A.1(a) because this element is identical to the preamble of claim 1.  *See* Ex. 1002, ¶¶229-230.

**(b)    Element [7.A]: providing a common multi-channel server coupled to one or more e-banking touch points and also coupled to one or more computer systems, wherein each computer system is associated with a financial institution, said e-banking touch points being provided in locations remote from the other:**

The differences between elements 1.A and 7.A are insubstantial.  *See* Ex. 1002, ¶¶232-233 (explaining the minor differences between elements 1.A and 7.A, and that a POSITA would not view the differences as adding any novelty).

Accordingly, Lawlor alone, or view of Bouve, discloses or renders obvious this element for the reasons discussed in Section IX.A.1(b).

**(c)    Element [7.B]: each of which comprise one or more of an automatic teller/transaction machine (ATM), a self-service coin counter (SSCC), a kiosk, a digital signage display, an online accessible banking website, a personal digital assistant (PDA), a personal computer (PC), a laptop, a wireless device, or a combination of two or more thereof, and wherein at least one of said e-banking touch points is in communication with one or more financial institutions through said multi-channel server;**

The minor differences between elements 1.B and 7.B are semantical and do not add novelty.  *See* Ex. 1002, ¶¶235-238.

Accordingly, Lawlor alone, or view of De Leo, discloses or renders obvious this element for the reasons discussed in Section IX.A.1(c).

> **(d)    *Element [7.C]: receiving an actionable input from at least one e-banking touch point;***

Lawlor, alone or in combination with De Leo, discloses or renders this element obvious for the same reasons described in Section IX.A.1(d) because this element is identical to the Element 1.C.  *See* Ex. 1002, ¶239.

> **(e)    *Element [7.D]: retrieving previously stored data associated with said actionable input, wherein said previously stored data is accessible to any one of said e-banking touch points, and said previously stored data comprises data from one or more financial institutions and one or more user-defined preferences;***

Lawlor, alone or in combination with De Leo, discloses or renders this element obvious for the same reasons described in Section IX.A.1(e) because this element is identical to the Element 1.D.  *See* Ex. 1002, ¶240.

> **(f)    *Element [7.E]: delivering said retrieved data to said at least one e-banking touch point transmitting said actionable input;***

Lawlor, alone or in combination with De Leo, discloses or renders this element obvious for the same reasons described in Section IX.A.1(f) because this element is identical to the Element 1.E.  *See* Ex. 1002, ¶241.

U.S. PATENT 8,862,508
Petition for *Inter Partes* Review

**(g)** ***Element [7.F]: storing transactional usage data associated with said at least one e-banking touch point transmitting said actionable input, wherein said stored transactional usage data is accessible by any one of said e-banking touch points and said one or more computer systems;***

Lawlor, alone or in combination with De Leo, discloses or renders this element obvious for the same reasons described in Section IX.A.1(g) because this element is identical to the Element 1.F.  *See* Ex. 1002, ¶242.

**(h)** ***Element [7.G]: monitoring via said server said active session in real-time for selection of targeted marketing content correlated to said user-defined preferences;***

Lawlor, alone or in combination with De Leo, discloses or renders this element obvious for the same reasons described in Section IX.A.1(h) because this element is identical to the Element 1.G.  *See* Ex. 1002, ¶243.

**(i)** ***Element [7.H]: subsequent to said monitoring, selecting in real-time said targeted marketing content correlated to said user-defined preferences; and***

Lawlor, alone or in combination with De Leo, discloses or renders this element obvious for the same reasons described in Section IX.A.1(i) because this element is identical to the Element 1.H. *See* Ex. 1002, ¶244.

**(j)** ***Element [7.I]: transmitting in real-time said targeted marketing content during said active session to at least one of said e-banking touch points for acceptance, rejection, or no response by a user, wherein said response by said user is used during said active session to determine whether transmission of additional***

59

*information related to said marketing content occurs during said active session.*

Lawlor, alone or in combination with De Leo, discloses or renders this element obvious for the same reasons described in Section IX.A.1(j) because this element is identical to the Element 1.I. *See* Ex. 1002, ¶245.

**6.    Claim 9: wherein said user-defined preferences comprise one or more of a customer name, a language to be used in connection with one or more of said touch points, an account for conducting transactions, and a monetary amount to be the subject of select transactions.**

Lawlor, alone or in combination with De Leo, discloses or renders obvious this element for the reasons discussed regarding claim 3 because claim 9 is identical to claim 3 except for its dependency.  *See* Ex. 1002, ¶246

**7.    Claim 11: wherein said method permits distribution of one or more of advertisements, messages, offers and promotions.**

Lawlor, alone or in combination with De Leo, discloses or renders obvious this element for the reasons discussed regarding claim 5 because claim 11 is identical to claim 5 except for its dependency.  *See* Ex. 1002, ¶247.

**8.    Claim 12: further comprising the step of transmitting additional information related to said marketing content during said active session.**

Lawlor, alone or in combination with De Leo, discloses or renders obvious this element for the reasons discussed regarding claim 6 because claim 12 is identical to claim 6 except for its dependency.  *See* Ex. 1002, ¶248.

**B. Ground II:  Claims 13, 15-16, and 19-20 are obvious over Lawlor in view of Bouve, De Leo, Looney, and Kawan.**

### 1.    Claim 13

**(a)    *Preamble: A unified electronic banking system, said system comprising:***

Lawlor discloses or renders this element obvious for the same reasons described in Section IX.A.1(a) because this element is substantively identical to the preamble of claim 1.  *See* Ex. 1002, ¶¶251-252.

**(b)    *Element [13.A]: a common multi-channel server, wherein said multi-channel server is communicatively coupled to one or more independent computer systems:***

Lawlor, alone or in combination with Kawan, discloses or renders this element obvious.

As illustrated below and explained in more detail with respect to Element [1.A], Lawlor's central computer 52 (red) is *a common multi-channel server*.  *See supra* Section IX.1.A(b), Ex. 1002, ¶254.  Further, Lawlor's central computer (red) (*a common multi-channel server*) is *communicatively coupled* to a number of banks (blue) over a number of different communications channels (green).  *See id.*

U.S. PATENT 8,862,508
Petition for *Inter Partes* Review



FIG. 1

Lawlor adds that "central computer 52 logs the payment in its output file which it will eventually add to a scheduled transaction log so that the payment will automatically be processed on the appropriate day." *See* Ex. 1004, 42:47-43:9. In some embodiments "an independent Service provider may operate central computer 52 and distribute terminals 54 as part of an ongoing business independent from the banking business." *See id.*, 22:34-36. That is, the banks 64 may be independent from the central computer 52. *See* Ex. 1002, ¶255.

A POSITA would have understood that these banks would contain *one or more independent computer systems* to handle their business like to managing client accounts and verifing funds. *See* Ex. 1002, ¶256.

62

To the extent it is argued that Lawlor does not disclose *one or more independent computer systems*, Kawan does.

Kawan explains that a "financial institution, such as a consumer banking institution, utilizes an automated system, including a host computer, for maintaining records of customer accounts. These records are used to keep track of funds in the customer accounts, to enter debits and credits made to such accounts, and for other purposes." *See* Ex. 1008, 3:3-8. That is, Kawan describes that banks contain *one or more independent computer systems*. *See* Ex. 1002, ¶257.

Accordingly, Lawlor, alone or in combination with Kawan, discloses or renders obvious this element. *See id.*, ¶258.

### (i)    A POSITA would have been Motivated to Apply the Teachings of Kawan to Lawlor

A POSITA would have been motivated to combine the teachings of Kawan, which is also analogous art in the field of computer-based banking systems, with Lawlor's system. Specifically, a POSITA would have been motivated to modify Lawlor's system to include Kawan's one or more independent banking computer systems. Ex. 1002, ¶259.

Lawlor explains that its remote terminals can be used for home-banking. *See* Ex. 1004, 42:47-43:9; Ex. 1002, ¶259. Kawan provides details of the banking side of this process. *See* Ex. 1008, 3:3-8, Ex. 1002, ¶259.

Thus, a POSITA would have used Kawan's well-known independent bank system to improve Lawlor's broader system.  *See* Ex. 1002, ¶¶259-260.  Kawan merely explains the details a POSITA would have understood that Lawlor's system requires.  *See id.*

That is, a POSITA would have understood that applying Kawan's known techniques to Lawlor's system would achieve the predictable result of Lawlor's working system.  Ex. 1002, ¶260.

### (ii)    A POSITA would have had a Reasonable Expectation of Success

A POSITA would have had a reasonable expectation of success in combining Kawan's independent banking system with Lawlor's system as described above.  *See* Ex. 1002, ¶261.  A POSITA would have found it straightforward to apply well-known techniques and approaches into a system that requires it to operate as described.  *See id.*

Since implementing a system like Kawan's is required for Lawlor's system to operate and relies only on components already in Lawlor's system to work, it would have been straightforward to incorporate Kawan's instantaneous transmission of additional information because it would have involved no significant modification to Lawlor.  *See* Ex. 1002, ¶¶262-263.  Implementing Kawan's independent banking system into Lawlor would have yielded the predictable result of allowing Lawlor to perform the operation Lawlor describes.  *See id.*

64

    **(c)**    ***Element [13.B]: wherein each of one or more independent computer systems is associated with an independent financial institution, and each of said computer systems is communicatively coupled to said multi-channel server;***

Lawlor, alone or in combination with Kawan, discloses or renders this element obvious. *See* Ex. 1002, ¶265.

As explained above, both Lawlor and Kawan disclosed that banks would have *independent computer systems* that are *communicatively coupled to said multi-channel server*. *See supra* section IX.B.1(b). By their very nature, and as Kawan expressly states, the *independent computer systems* are *associated with an independent financial institution*. *See* Ex. 1002, ¶266.

Accordingly, Lawlor, alone or in combination with Kawan, discloses or renders Element [13.B] obvious.

    **(d)**    ***Element [13.C]: one or more e-banking touch points, each of which comprise one or more of an automatic teller/transaction machine (ATM), a self-service coin counter (SSCC), a kiosk, a digital signage display, an online accessible banking website, a personal digital assistant (PDA), a personal computer (PC), a laptop, a wireless device, or a combination of two or more thereof, wherein one or more of said e-banking touch points are communicatively coupled to said multi-channel server, and wherein at least one of said e-banking touch points is in communication with one or more financial institutions through said multi-channel server;***

Lawlor, alone or in combination with De Leo, discloses or renders this element obvious for the same reasons described in Section IX.A.1(d) because this element is substantively identical to Element 1.C. *See* Ex. 1002, ¶¶268-270.

> **(e)    *Element [13.D]: a data storage device, wherein transactional usage data associated with a transaction initiated by a user through one of said e-banking touch points is stored in said data storage device and accessed by one or more of said other e-banking touch points; and***

Lawlor, alone or in combination with De Leo, discloses or at least renders this element obvious for the same reasons described in Section IX.A.1(g) because this element is substantively identical to Element 1.F.  *See* Ex. 1002, ¶¶271-274.

The only differences are that Element [13.D] recites 1) *a data storage device* and 2) *wherein transactional usage data associated with a transaction*.

The *transactional usage data* is stored on the mass storage device (*a data storage device*) of Lawlor's central computer.  *See* Ex. 1004, 47:25-47; Ex. 1002, ¶¶272-274.  Since the *transactional usage data* is associated with functions such as "pay bill," the stored data is *associated with a transaction*.  *See id.*

Thus, Lawlor, alone or in combination with De Leo, discloses or renders obvious Element [13.D].

> **(f)    *Element [13.E]: wherein said active session is monitored via said server in real-time for selection of targeted marketing content correlated to said user-defined preferences, said targeted marketing content correlated to said user-defined preferences is selected***

> **subsequent to said monitoring and transmitted in real-time to at least one of said e-banking touch points for acceptance, rejection, or no response by a user, and wherein said response by said user is used during said active session to determine whether transmission of additional information related to said marketing content occurs during said active session.**

Lawlor, alone or in combination with De Leo, discloses or at least renders this element obvious for the same reasons described in Section IX.A.1(h)-(j) because this element is substantively identical to Element 1.G-1.I.  *See* Ex. 1002, ¶¶275-277.

### 2.    Claim 15: wherein said user-defined preferences comprise one or more of a customer name, a language to be used in connection with one or more of said touch points, an account for conducting transactions, and a monetary amount to be the subject of select transactions.

Lawlor, alone or in combination with De Leo, discloses or at least renders obvious this element for the reasons discussed with respect to claim 3 because claim 15 is identical to claim 3 except for its dependency.

### 3.    Claim 16: wherein said transactional usage data may be used to analyze specific customer habits.

Lawlor, discloses or at least renders obvious, this element.  *See* Ex. 1002, ¶¶279-281.

As explained previously regarding Element [1.F], Lawlor stores user payments (*said transactional usage data*).  *See supra* Section IX.A.1(g); *id.*

Lawlor analyzes the user's *transactional usage data* to determine if they are paying a mortgage, "detected by mortgage payments or a lack of rental payments in the database" (*analyze specific customer habits*).  *See* Ex. 1004, 39:25-44.  Lawlor can do the same for renters.  *See id.*

Thus, Lawlor discloses or at least renders obvious Element [16.A].  *See* Ex. 1002, ¶¶279-281.

### 4.    Claim 19: wherein said system, permits distribution of one or more of advertisements, messages, offers and promotions.

Lawlor alone, or in combination with De Leo, discloses or renders this limitation obvious for at least the reasons as Lawlor alone, or in combination with De Leo, discloses or renders obvious claim 5.  *See* Ex. 1002, ¶282.

Claims 5 and 19 are virtually identical except that claim 19 recites "wherein said system" instead of "wherein said method," which a POSITA would view as a patentable distinction.  *See id.*

### 5.    Claim 20: wherein said additional information related to said marketing content is transmitted during said active session.

Lawlor alone, or in combination with De Leo, discloses or renders this limitation obvious for at least the reasons as Lawlor alone, or in combination with De Leo, discloses or renders obvious claim 6.  *See* Ex. 1002, ¶283.

Claims 6 and 20 are virtually identical except for verb tense, which a POSITA would view as a patentable distinction.  *See id.*

### C. Ground III:  Claims 4 and 10 are obvious over Lawlor in view of Bouve, De Leo, Looney, and Arsenault

**1.   Claim 4: further comprising the step of determining whether said marketing content is classified as being one or more of current or approved content**

Lawlor, in combination with Arsenault, renders this element obvious.  *See* Ex. 1002, ¶¶287-290.

Arsenault describes that when a remote terminal receives a new advertisement, the advertisement is only stored if it is listed in the roster of current advertisements (*determining whether said marketing content is classified as being one or more of current*).  *See* Ex. 1009, 14:37-40.  Arsenault also described "some [advertisement] objects may be discarded rather than cached… [if] the object is incompatible with the sophistication level" of the remote terminal.  *See id.*, 4:31-38; Ex. 1002, ¶288.  That is, Arsenault determines *whether said marketing content is… approved content* for a specific remote terminal.  *See* Ex. 1004*.,* 14:40-48; Ex. 1002, ¶289.

Thus, Lawlor in combination with Arsenault renders obvious Element [4.A].

### (i)   A POSITA would have been Motivated to Apply the Teachings of Arsenault to Lawlor

A POSITA would have been motivated to combine Arsenault's content control, which is also analogous art in the field of providing targeted advertisement

to different devices, with Lawlor's system. Specifically, a POSITA would have been motivated to modify Lawlor's system to check for suitable content. Ex. 1002, ¶291.

A POSITA, when employing De Leo's e-banking touch points in Lawlor's system, would have understood that the different De Leo e-banking touch points would have had different levels of sophistication. *See id.*, ¶¶290-291. Further, a POSITA would have understood that targeted content would fail if out of date offers were shown. *See id*.

Thus, a POSITA would have used Arsenault's content control to ensure that Lawlor's users only see appropriate content. *See id*.

That is, a POSITA would have understood that applying Arsenault's known content control techniques to Lawlor's system would achieve the predictable result of a system that only delivers appropriate content. *Id.*, ¶293. Moreover, a POSITA would have understood that employing Arsenault's content control would have been taking known techniques to improve Lawlor's system in the same way (showing users better advertisements etc.). *Id.*

### (ii)    A POSITA would have had a Reasonable Expectation of Success

A POSITA would have had a reasonable expectation of success in combining Arsenault with Lawlor as described above. *See* Ex. 1002, ¶293. A POSITA would have found it straightforward to add Arsenault's content control to Lawlor's system as it would only require adding rudimentary checks to Lawlor's remote terminals.

Since implementing these change would only affect the remote terminals, a POSITA would have understood that the modification does not require any hardware changes. *See id.*, ¶294. Arsenault's content control can be applied in almost any setting—reinforcing a POSITA's reasonable expectation of success that implementing Arsenault's content control into Lawlor would have yielded the predictable result of ensuring users received better advertisements. *See id.*, ¶¶293-294.

**2.    Claim 10: further comprising the step of determining whether said marketing content is classified as being one or more of current or approved content.**

Lawlor in combination with Arsenault renders Element [10.A] obvious for the same reasons that render claim 4 invalid because Element [10.A] is identical to element [4.A]. *See supra* Section IX.C.1(a) Ex. 1002, ¶295.

**D. Ground IV:  Claim 18 is obvious over Lawlor in view of Bouve, De Leo, Looney, Kawan, and Arsenault**

**3.    Claim 18: wherein said marketing content is classified as being one or more of current or approved content.**

Lawlor in combination with Arsenault renders Element [18.A] obvious for the same reasons that render claim 4 invalid because Element [18.A] is substantively identical to Element [4.A]. *See supra* Section IX.C.1(a) Ex. 1002, ¶296.

**X.    SECONDARY CONSIDERATIONS OF NONOBVIOUSNESS**

Petitioner is not aware of any meaningful secondary considerations of non-obviousness. No other evidence would overcome the evidence of obviousness presented herein. *See id.*, ¶297.

## XI.  DISCRETIONARY FACTORS FAVOR INSTITUTION

### A.    35 U.S.C. § 314(a)

Under the factors set forth in *Apple v. Fintiv*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020), discretionary denial of institution in light of district court litigation involving the '508 Patent would be improper. IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020).

Petitioner is not party to and is not involved, in any way, in the 33 district court proceedings regarding the '508 Patent. *See* Section II.B. Additionally, the public records indicate that those cases are in early stages where most have not set trial dates nor had Answers filed. Thus, the *Fintiv* factors weigh against discretionary denial. There is no evidence that a stay would be denied if requested. Further, because Petitioner is not involved in the litigation, a stay would not affect this proceeding's outcome. Factor 1 weighs in favor of institution.

Most trial dates have not been set; Factor 2 weighs against denial.

Petitioner has no investment in the district court cases, but has invested time and resources preparing this Petition. Further, because these cases are in their early

stages, any parties' and courts' investments have been minimal.  Therefore, Factor 3 weighs in favor of institution.  *Id*.

Petitioner is unaware of the asserted claims, and it appears from the public records that no invalidity contentions have been served.  Therefore, there is little known overlap between the cases, and Factor 4 weighs in favor of institution.  *Id*.

Petitioner is not a defendant in any of the other cases.  Therefore, Factor 5 weighs in favor of institution.  *Id*.

Regarding Factor 6, the challenged claims are unpatentable on multiple strong grounds that pertain to novelty. *See* Section IX.  Additionally, the litigiousness of the Patent Owner in asserting the '508 Patent in multiple distinct district court litigations in the past 8 months provides support for institution so as to prevent judicial inefficiency in multiple validity proceedings across a myriad of district courts.  As such, Factor 6 weighs in favor of institution.  *Id*.

The '508 Patent has not been challenged in any prior petition.  Thus, none of the *General Plastic* factors apply.  *See Gen. Plastic Indus. Co. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 at 16 (PTAB Sept. 6, 2017).

### B.    35 U.S.C. § 325(d)

Non-institution would be improper under § 325(d) and in view of the factors set forth in *Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017-01586,

U.S. PATENT 8,862,508
Petition for *Inter Partes* Review

Paper 8 at 6-7 (PTAB Dec. 15, 2017). None of the relied upon references were before the Office during prosecution.

## XII. CONCLUSION

The Challenged Claims are unpatentable. Petitioner requests institution of an IPR and cancellation of the Challenged Claims.

Respectfully Submitted,

*/s/ David Tennant*
David Tennant
Registration No. 48,362

74

U.S. PATENT 8,862,508
Petition for *Inter Partes* Review

CERTIFICATION OF WORD COUNT UNDER 37 CFR § 42.24(d)

Pursuant to 37 C.F.R. §§ 42.24(d) and 42.24(a)(1), I hereby certify that the number of words in this Petition is 13,974 excluding the table of contents, table of authorities, mandatory notices under § 42.8, certificate of service, certificate of word count, and the listing of exhibits.


Respectfully Submitted,

*/s/ David Tennant*
David M. Tennant
Registration No. 48,362

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Unified Patents, LLC. | § | Petition for *Inter Partes* Review |
| Petitioner | § | |
| | § | U.S. Patent 8,862,508 |

## CERTIFICATE OF SERVICE

The undersigned certifies, in accordance with 35 C.F.R. §§ 42.105 and 42.6, that service was made on the Patent Owner as detailed below.

| | |
|---|---|
| *Date of service* | October 15, 2021 |
| *Manner of service* | Express Mail (EE 404 422 098 US) |
| *Documents served* | Petition for Inter Partes Review, including Exhibit List; Exhibits 1001 through 1010, and Power of Attorney |
| *Persons served* | FERENCE & ASSOCIATES LLC<br>409 Broad Street<br>Pittsburgh, PA 15143<br><br>RAMEY & SCHWALLER, LLP (courtesy copy)<br>5020 Montose Blvd., Suite 800<br>Houston, TX 77006 |

/Victoria Moffa/
Victoria Moffa
Allen & Overy LLP