# EXHIBIT 2

Trials@uspto.gov                                             Paper 11
571-272-7822                                          Date: March 7, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

UNIFIED PATENTS, LLC,
Petitioner,

v.

MCOM IP, LLC,
Patent Owner.

————————————

IPR2022-00055
Patent 8,862,508 B2

————————————

Before ERIC C. JESCHKE, FREDERICK C. LANEY, and
BRENT M. DOUGAL, *Administrative Patent Judges*.

JESCHKE, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2022-00055
Patent 8,862,508 B2

## I.  BACKGROUND

Petitioner, Unified Patent, LLC, filed a Petition to institute *inter partes* review of claims 1, 3–7, 9–13, 15, 16, and 18–20 (the "challenged claims") of U.S. Patent No. 8,862,508 B2 (Ex. 1001, "the '508 patent"). Paper 1 ("Pet."). MCOM IP, LLC ("Patent Owner") filed a Preliminary Response. Paper 7 ("Prelim. Resp.").

We have authority to determine whether to institute an *inter partes* review. *See* 35 U.S.C. § 314 (2018); 37 C.F.R. § 42.4(a) (2021) ("The Board institutes the trial on behalf of the Director."). Section 314(a) of Title 35 of the United States Code provides that an *inter partes* review may not be instituted "unless . . . the information presented in the petition . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." Upon consideration of the evidence and arguments in the Petition (including its supporting testimonial evidence) as well as the evidence and arguments in the Preliminary Response (including its supporting testimonial evidence), for the reasons below, we determine that the information presented shows a reasonable likelihood that Petitioner would prevail with respect to at least one of the challenged claims. We thus institute *inter partes* review on all challenged claims on all asserted grounds. *See SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1354, 1359–60 (2018); 37 C.F.R. § 42.108(a) ("When instituting *inter partes* review, the Board will authorize the review to proceed on all of the challenged claims and on all grounds of unpatentability asserted for each claim.").

IPR2022-00055
Patent 8,862,508 B2

### A. Related Proceedings

The parties identify several proceedings involving the '508 patent:

- *MCOM IP, LLC v. Vantage Bank Texas*, No. 6:21-cv-00996 (W.D. Tex.), filed Sept. 28, 2021;

- *MCOM IP, LLC v. Corporate America Family Credit Union*, No. 6:21-cv-02285 (W.D. Tex.), filed Sept. 24, 2021;

- *MCOM IP, LLC v. Unisys Corp.*, No. 6:21-cv-02288 (W.D. Tex.), filed Sept. 24, 2021;

- *MCOM IP, LLC v. Blend Labs, Inc.*, No. 1:21-cv-07975 (S.D.N.Y.), filed Sept. 24, 2021;

- *MCOM IP, LLC v. Woodforest National Bank*, No. 6:21-cv-00989 (W.D. Tex.), filed Sept. 24, 2021;

- *MCOM IP, LLC v. FCTI, Inc.*, No. 2:21-cv-07474 (C.D. Cal.), filed Sept. 17, 2021;

- *MCOM IP, LLC v. Nautilus Hyosung Americas, Inc.*, No. 6:21-cv-02215 (N.D. Tex.), filed Sept. 17, 2021;

- *MCOM IP, LLC v. International Business Machines Corp.*, No. 6:21-cv-00966 (W.D. Tex.), filed Sept. 17, 2021;

- *MCOM IP, LLC v. Fiserv, Inc.*, No. 6:21-cv-00827 (W.D. Tex.), filed Aug. 10, 2021;

- *MCOM IP, LLC v. FIS Global, Inc.*, No. 6:21-cv-00826 (W.D. Tex.), filed Aug. 10, 2021;

- *MCOM IP, LLC v. MX Technologies, Inc.*, No. 6:21-cv-00829 (W.D. Tex.), filed Aug. 10, 2021;

- *MCOM IP, LLC v. Avaya Holdings Corp.*, No. 3:21-cv-01550 (N.D. Tex.), filed July 21, 2021;

IPR2022-00055
Patent 8,862,508 B2

- *MCOM IP, LLC v. Diebold Nixdorf, Inc.*, No. 6:21-cv-00698 (W.D. Tex.), filed July 21, 2021;

- *MCOM IP, LLC v. Unicom Systems, Inc.*, No. 2:21-cv-00168 (E.D. Tex.), filed May 14, 2021;

- *MCOM IP, LLC v. Wells Fargo*, No. 6:21-cv-00500 (W.D. Tex.), filed May 14, 2021;

- *MCOM IP, LLC v. Infosys, Inc.*, No. 6:21-cv-00499 (W.D. Tex.), filed May 14, 2021;

- *MCOM IP, LLC v. First Tech Federal Credit Union*, No. 6:21-cv-00480 (W.D. Tex.), filed May 7, 2021;

- *MCOM IP, LLC v. Redpoint Global Inc.*, No. 1:21-cv-10657 (D. Mass.), filed April 20, 2021;

- *MCOM IP, LLC v. Redpoint Global Inc.*, No. 6:21-cv-00325 (W.D. Tex.), filed April 5, 2021;

- *MCOM IP, LLC v. PNC Financial Services Group, Co., Inc.*, No. 6:21-cv-00217 (W.D. Tex.), filed March 5, 2021;

- *MCOM IP, LLC v. US Bank, National Association Co.*, No. 6:21-cv-00216 (W.D. Tex.), filed March 5, 2021;

- *MCOM IP, LLC v. BBVA USA Bancshares, Inc.*, No. 6:21-cv-00218 (W.D. Tex.), filed March 5, 2021;

- *MCOM IP, LLC v. DH Corporation*, No. 6:21-cv-00197 (W.D. Tex.), filed March 2, 2021;

- *MCOM IP, LLC v. CSI, Inc.*, No. 6:21-cv-00196 (W.D. Tex.), filed March 2, 2021;

- *MCOM IP, LLC v. NCR Corp.*, No. 6:21-cv-00325 (W.D. Tex.), filed April 4, 2021;

IPR2022-00055
Patent 8,862,508 B2

- *MCOM IP, LLC v. First Tech Federal Credit Union*, No. 2:21-cv-00168 (E.D. Tex.), filed May 14, 2021;

- *MCOM IP, LLC v. Diebold Nixdorf, Inc.*, No. 3:21-cv-01550 (W.D. Tex.), filed July 2, 2021;

- *MCOM IP, LLC v. Avaya Holdings Corp.*, No. 6:21-cv-00698 (N.D. Tex.), filed July 2, 2021;

- *MCOM IP, LLC v. Unicom Systems, Inc.*, No. 6:21-cv-00500 (W.D. Tex.), filed May 7, 2021;

- *MCOM IP, LLC v. Wells Fargo*, No. 6:21-cv-00827 (W.D. Tex.), filed Aug. 10, 2021;

- *MCOM IP, LLC v. Fiserv, Inc.*, No. 6:21-cv-00827 (W.D. Tex.), filed Aug. 10, 2021;

- *MCOM IP, LLC v. FIS Global, Inc.*, No. 6:21-cv-00826 (W.D. Tex.), filed Aug. 10, 2021; and

- *MCOM IP, LLC v. MX Technologies, Inc.*, No. 6:21-cv-00829 (W.D. Tex.), filed Aug. 10, 2021.

Pet. 1–4; Paper 4 (Patent Owner's Mandatory Notices) at 2–4.

### B.   Real Parties in Interest

Petitioner identifies itself as the real party in interest.  Pet. 1 (citing Ex. 1010).  Patent Owner identifies itself as the sole real party in interest. Paper 4 at 2.

### C.   The '508 Patent

The '508 patent "is directed to a system and method for delivering a retail banking multi-channel solution that unifies interactive electronic banking touch points to provide personalized financial services to customers

IPR2022-00055
Patent 8,862,508 B2

and a common point of control for financial institutions." Ex. 1001, 1:18–

23. Figure 1 is reproduced below:



**FIG. 1**

Figure 1 depicts "a schematic diagram of a banking platform system networked with a modular multi-channel server." Ex. 1001, 2:56–57. Depicted system 100 includes "multi-channel server 102 networked to a plurality of branch locations 104 associated with a financial institution, wherein each branch location employs the use of various e-banking touch

IPR2022-00055
Patent 8,862,508 B2

points 106." *Id.* at 3:28–33.[1]  As examples of e-banking touch points 106, the '508 patent discloses "an automatic teller/transaction machine (ATM) touch point 106b, a self-service coin counter (SSCC) touch point 106a, a plasma signage display (PSD) touch point 106c, alternate e-banking system touch points (e.g., a kiosk) or any combination thereof." *Id.* at 3:33–38.

"Multi-channel server 102 is additionally coupled to a marketing computer system 108 and an operations computer system 110 via the network." Ex. 1001, 3:42–44.  The '508 patent also discloses exemplary databases 112a–d, with data related to customer statistics, customer transactions, personalized customer content, and marketing.  *See id.* at 3:64–4:8.  "Customers of the financial institution may interact with multi-channel server 102 via an Internet network 114 utilizing web-enabled customer devices 116," such as personal digital assistant device 116a, personal computer 116b, or wireless laptop 116c.  *Id.* at 4:9–15.

In operation, a user can authenticate their identity using e-banking touch point 106, and then server 102 retrieves and delivers data, including data associated with the user's preferences, to e-banking touch point 106. *See* Ex. 1001, 4:52–5:7.  Marketing personnel may use marketing computer system 108 to manage marketing campaigns, including scheduling delivery of certain marketing materials to customers via e-banking touch points 106. *See id.* at 6:33–7:12.

### D.  Challenged Claims

Petitioner challenges claims 1, 3–7, 9–13, 15, 16, and 18–20, of which claims 1, 7, and 13 are independent.  Claims 3–6 depend from claim 1,

---

[1]   In this Decision, we omit emphasis on reference numerals in quotations from the '508 patent and prior art references.

IPR2022-00055
Patent 8,862,508 B2

claims 9–12 depend from claim 7, and claims 15, 16, and 18–20 depend from claim 13. Independent claim 1 is reproduced below, reformatted from the version provided in the '508 patent and with bracketed letters and numbers added to identify certain language:

1. [**1pre**] A method for constructing a unified electronic banking environment, said method comprising the steps of:

[**1.A**] providing at least one common multi-channel server coupled to more than one e-banking touch points and also coupled to at least one computer system configured with at least one control console, said more than one e-banking touch points and said at least one computer system being provided in locations remote from the other, [**1.B**] and further wherein said more than one plurality of e-banking touch points are comprised of at least two different types of e-banking touch point devices, each of which comprise one or more of an automatic teller/transaction machine (ATM), a self service coin counter (SSCC), a kiosk, a digital signage display, an online accessible banking website, a personal digital assistant (PDA), a personal computer (PC), a laptop, a wireless device, or a combination of two or more thereof, and wherein at least one of said e-banking touch points is in communication with one or more financial institutions through said multi-channel server;

[**1.C**] receiving an actionable input from at least one e-banking touch point;

[**1.D**] retrieving previously stored data associated with said actionable input, wherein said previously stored data is accessible to any one of said e-banking touch points, and said previously stored data comprises data from one or more financial institutions and one or more user-defined preferences;

[**1.E**] delivering said retrieved data to said at least one e-banking touch point transmitting said actionable input;

[**1.F1**] storing transactional usage data associated with said at least one e-banking touch point transmitting said actionable input, [**1.F2**] wherein said stored transactional usage

IPR2022-00055
Patent 8,862,508 B2

> data is accessible by any one of said more than one e-banking touch points and said at least one computer system;

> [**1.G**] monitoring via said server an active session in real-time for selection of targeted marketing content correlated to said user-defined preferences;

> [**1.H**] subsequent to said monitoring, selecting in real-time said targeted marketing content correlated to said user-defined preferences; and

> [**1.I**] transmitting in real-time said targeted marketing content during said active session to at least one of said e-banking touch points for acceptance, rejection, or no response by a user, wherein said response by said user is used during said active session to determine whether transmission of additional information related to said marketing content occurs during said active session.

Ex. 1001, 8:44–9:24.[2]

### E.  *Asserted Grounds of Unpatentability*

Petitioner challenges claims 1, 3–7, 9–13, 15, 16, and 18–20 on the following grounds:

---

[2]  We adopt Petitioner's designations for the elements of the challenged claims.  *See* Pet. 15–54 (showing numerical designations for the language in the challenged claims).  We apply these designations below.

IPR2022-00055
Patent 8,862,508 B2

| Claim(s) Challenged | 35 U.S.C. §[3] | Reference(s)/Basis |
|---|---|---|
| 1, 3, 5–7, 9, 11, 12 | 103(a) | Lawlor[4], Bouve[5], De Leo[6], Looney[7] |
| 13, 15, 16, 19, 20 | 103(a) | Lawlor, Bouve, De Leo, Looney, Kawan[8] |
| 4, 10 | 103(a) | Lawlor, Bouve, De Leo, Looney, Arsenault[9] |
| 18 | 103(a) | Lawlor, Bouve, De Leo, Looney, Kawan, Arsenault |

Petitioner supports its challenges with a declaration from Mr. Ian Jestice. Ex. 1002 ("Jestice Decl."). Patent Owner relies on the Declaration of Mr. Perry Landers. Ex. 2001 ("the Landers Declaration" or "Landers Decl.").[10]

---

[3]    The Leahy-Smith America Invents Act ("AIA") included revisions to 35 U.S.C. § 103 that became effective on March 16, 2013. Pub. L. No. 112-29, §§ 3(c), 3(n)(1), 125 Stat. 284, 287, 293 (2011). Because there is no dispute that the challenged claims of the '508 patent have an effective filing date before March 16, 2013, we apply the pre-AIA version of this statute. We would reach the same outcome, however, under the AIA version of the statute.

[4]    US 5,870,724, issued Feb. 9, 1999 (Ex. 1004, "Lawlor").

[5]    US 5,682,525, issued October. 28, 1997 (Ex. 1006, "Bouve").

[6]    US 2003/0141360 A1, published July 31, 2003 (Ex. 1005, "De Leo").

[7]    US 7,925,549 B2, issued April 12, 2011 (Ex. 1007, "Looney").

[8]    US 5,796,832, issued August 18, 1998 (Ex. 1008, "Kawan").

[9]    US 7,877,290 B1, issued January 25, 2011 (Ex. 1009, "Arsenault").

[10]    We refer to the corrected version of the Landers Declaration, filed on February 8, 2022.

IPR2022-00055
Patent 8,862,508 B2

## II.  DISCUSSION

### A.  *The Level of Ordinary Skill in the Art*

The level of ordinary skill in the art is "a prism or lens" through which we view the prior art and the claimed invention.  *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).  The person of ordinary skill in the art is a hypothetical person presumed to have known the relevant art at the time of the invention.  *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).  In determining the level of ordinary skill in the art, we may consider certain factors, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field."  *Id.*

Petitioner contends, with accompanying declaration testimony, that a person having ordinary skill in the art at the time of the invention "would have had at least (i) a Bachelor of Science in Computer Science, Computer Engineering, Information Systems, or the equivalent, and (ii) approximately two years of experience with data/content selection and transmission-related fields."  Pet. 14–15 (citing Jestice Decl. ¶¶ 31–32).

Patent Owner does not address Petitioner's proposal, but in a section of the Preliminary Response addressing claim construction, Patent Owner states:

> A person of ordinary skill in the art is defined as having a bachelor's degree in Computer Science, electrical engineering, or highly related field, and would have had at least two years' experience in cybersecurity systems, especially in electronic payment and ecommerce systems.  Alternatively, a non-degreed practitioner with eight years of experience in cybersecurity systems would also be considered one of ordinary skill in the art.

11

IPR2022-00055
Patent 8,862,508 B2

Prelim. Resp. 4.

For purposes of this Decision, we adopt the definition of the level of ordinary skill in the art proposed by Petitioner. That definition is supported by the cited testimony of Mr. Jestice, which provides additional background on the "basis for [his] familiarity with the level of ordinary skill," and which we find persuasive on this issue. *See* Pet. 14–15 (citing Jestice Decl. ¶¶ 31–32). Petitioner's proposed definition of the level of ordinary skill in the art also appears consistent with the record at this stage of the proceeding, including the prior art. *See GPAC Inc.*, 57 F.3d at 1579.

In contrast, Patent Owner's assertion does not identify supporting testimony from Mr. Landers. *See* Prelim. Resp. 4. In a paragraph not cited in the Preliminary Response, however, Mr. Landers repeats Patent Owner's statement (shown in the block quotation above) as to the qualifications that "[a] person of ordinary skill in the art *is defined as having* . . . ." Landers Decl. ¶ 20 (emphasis added); *compare id.*, *with* Prelim. Resp. 4. Because Mr. Landers does not adequately explain *who* or *what* provided that definition, we view that position as entitled to little weight. *See* 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight."). We note that Patent Owner does not argue, at this stage of the proceeding, that Petitioner's proposal for the level of ordinary skill leads to an improper understanding of how a skilled artisan would understand either the '508 patent or the prior art.

### B. *Claim Construction*

In *inter partes* reviews, the Board interprets claim language using the same claim construction standard that would be used in a civil action under

IPR2022-00055
Patent 8,862,508 B2

35 U.S.C. § 282(b), as described in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). *See* 37 C.F.R. § 42.100(b). Under that standard, we generally give claim terms their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art at the time of the invention, in light of the language of the claims, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1313–14. Although extrinsic evidence, when available, may also be useful when construing claim terms under this standard, extrinsic evidence should be considered in the context of the intrinsic evidence. *See id.* at 1317–19.

### 1. Overview

Petitioner states that, "[f]or purposes of this Petition, no specific claim construction (beyond plain and ordinary meaning) is necessary." Pet. 15. Patent Owner discusses the following claim terms: (1) "at least one computer system configured with at least one control console" in independent claim 1; (2) "actionable input" in independent claims 1 and 7, and "active session" in independent claims 1, 7, and 13; and (3) "subsequent to said monitoring, selecting in real-time said targeted marketing content correlated to said user-defined preferences"[11] in independent claims 1 and 7. *See* Prelim. Resp. 4–9.

Based on the current record and for purposes of this Decision, we discuss below the terms raised by Patent Owner. We do not discern a need to construe explicitly any other claim terms because doing so would not

---

[11] Although Patent Owner only addresses the claim language in claims 1 and 7, Patent Owner relies on the argument flowing from this claim construction position for similar language in claim 13, which recites "said targeted marketing content correlated to said user-defined preferences is selected subsequent to said monitoring." *See* Prelim. Resp. 27–28.

IPR2022-00055
Patent 8,862,508 B2

change the result of the analysis below.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (stating that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).  The parties may wish to develop these issues at trial.[12]

> 2.  *"at least one computer system configured with at least one control console" (claim 1)*

As part of element 1.A, claim 1 recites "at least one computer system configured with at least one control console" (the 'control console' limitation").  Ex. 1001, 8:48–49.  In discussing this limitation, Patent Owner provides the following annotated version of Figure 1 of the '508 patent:

---

[12]  Claim construction, in general, is an issue that may be addressed further at trial.  Claim construction will be determined at the close of all the evidence and after any hearing.  The parties are expected to assert all of their claim construction arguments and evidence in the remaining briefing during trial, as permitted by our rules.

IPR2022-00055
Patent 8,862,508 B2



**FIG. 1**

Prelim. Resp. 6.  Figure 1 depicts "a schematic diagram of a banking
platform system networked with a modular multi-channel server."  Ex. 1001,
2:56–57.  In the annotated version of Figure 1, Patent Owner added (1)
orange highlighting  for marketing computer system 108 and operations
computer system 110 and (2) green highlighting  for branch locations 104.
Prelim. Resp. 6.

   Patent Owner states that, "[a]ccording to the specification and the
language of claims of the '508 Patent, the term 'computer system configured
with at least one control console' refers to a marketing computer system or
an operation computer system, either the marketing computer system or the
operation computer system includes a console."  Prelim. Resp. 6–7.  Thus,

IPR2022-00055
Patent 8,862,508 B2

Patent Owner argues that the claimed "computer system configured with at least one control console" should be limited to either a marketing computer system or an operation computer system. *Id.* Although the Specification describes *an embodiment* with a "marketing computer system" and an "operations computer system"—as shown in Figure 1 (*see also, e.g.*, Ex. 1001, 3:42–44)—it is generally improper to read limitations from specific embodiments into the claims. *See Cadence Pharms. Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1369 (Fed. Cir. 2015) ("[E]ven if all of the embodiments discussed in the patent included a specific limitation, it would not be proper to import from the patent's written description limitations that are not found in the claims themselves." (internal quotations omitted)). Thus, contrary to Patent Owner's argument, we do not limit the recited "computer system" to a *marketing* computer system or *operations* computer system.

Patent Owner also states that, "[a]ccording to the language of claims of the '508 Patent and Fig. 1, neither the marketing computer system nor the operation computer system (orange [above]) is included in the financial institution (green [above])" and "[t]hus, the computer system is independent and outside of the financial institution, the multi-channel server and e-banking touch points." Prelim. Resp. 7 (citing Landers Decl. ¶ 25).

As an initial matter, the "control console" limitation—highlighted in the heading of this section of the Preliminary Response—does not recite the financial institution, multi-channel server, or e-banking touch points *at all*. *See* Prelim. Resp. 5–7; Ex. 1001, 8:48–49. We address below, in turn, Patent Owner's three assertions that other language in claim 1 requires that "the computer system is independent and outside of [(1)] the financial

IPR2022-00055
Patent 8,862,508 B2

institution, [(2)] the multi-channel server and [(3)] e-banking touch points."
Prelim. Resp. 7.

As to the first assertion, although claim elements 1.B and 1.D include recitations of "financial institutions," claim 1 does not require the recited "computer system" to be "independent and outside" of the "financial institutions" as argued.  To the extent Patent Owner relies on the depiction in Figure 1 of computer systems 108 and 110 separate from financial institutions 104, we note that it is generally improper to read limitations from specific depicted embodiments into the claims.  *See Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306–07 (Fed. Cir. 2003) (stating that "the mere fact that the patent drawings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration").

As to the second assertion regarding the multi-channel server, element 1.A requires "at least one common multi-channel server . . . coupled to at least one computer system" (Ex. 1001, 8:46–48), but does not recite that the "computer system" is "independent and outside" of the "multi-channel server" as argued.  To the extent Patent Owner relies on the depiction in Figure 1 of computer systems 108 and 110 separate from multi-channel server 102, again, it is generally improper to read limitations from specific depicted embodiments into the claims.  *See Anchor Wall Sys.*, 340 F.3d at 1306–07.

As to the third assertion regarding e-banking touch points, in element 1.A, after the "control console" limitation, claim 1 recites "said more than one e-banking touch points and said at least one computer system being provided in locations remote from the other." Ex. 1001, 8:49–52.  We need

IPR2022-00055
Patent 8,862,508 B2

not determine whether "in locations remote from" in that claim language should be construed as "independent and outside of," however, because doing so would not change the result of the analysis below (*see* § II.C.5.a). *See Nidec Motor*, 868 F.3d at 1017.

      3.   *"actionable input" (claims 1 and 7) & "active session"*
           *(claims 1, 7, and 13)*

Elements 1.C and 7.C recite "receiving an *actionable input* from at least one e-banking touch point" and element 1.G recites "monitoring via said server an *active session* in real-time for selection of targeted marketing content correlated to said user-defined preferences." Ex. 1001, 8:64–65, 9:12–14, 9:58–59 (emphasis added). Elements 7.G and 13.E recite similar uses of "active session." Patent Owner argues that "actionable input" and "active session" have different meanings. *See* Prelim. Resp. 7 (citing *SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 431 (Fed. Cir. 2016)).

We first address "actionable input." Patent Owner states that, "[g]iven its plain meaning, 'input' refers to 'information fed into a data processing system or computer'"[13] and that the full term—"actionable input"—"includes the process of feed[ing] information into the e-banking touch point but does not include the feedback from the e-banking touch point itself." *Id.* at 7–8 (citing Landers Decl. ¶ 26).

We need not determine whether this definition—including the proposed negative limitation—is correct because doing so would not change the result of the analysis below as Patent Owner presents no arguments

---

[13] Patent Owner does not provide a citation to the extrinsic evidence providing this definition for "input." Prelim. Resp. 7.

IPR2022-00055
Patent 8,862,508 B2

contesting Petitioner's assertions that the prior art teaches element 1.C.  *See Nidec Motor*, 868 F.3d at 1017.  The parties may wish to develop at trial, however, whether the "actionable input" includes inputs used to *begin* a "active session," whether an "actionable input" *only* includes inputs that occur *after* an "active session" has begun, or some other option.  *See, e.g.*, Ex. 1001, 4:55–60 ("A customer interaction session is initiated, at step 202, when the customer successfully logs into any accessible e-banking touch point 106.  For example, a customer may swipe a banking card or enter a pin authorizing him/her to access their account via the touch point.").

　　　We turn now to "active session" in element 1.G.  Patent Owner states that, "[g]iven its plain meaning, 'session' refers to 'a meeting or series of meetings of a body for the transaction of business.'"  Prelim. Resp. 8.  Then Patent Owner highlights passages in the Specification disclosing (1) how the "customer interacts with a touch point's user interface to carry out a transaction" (Ex. 1001, 4:49–51) (2) how "system 100 may be configured to monitor and record a customer's interactions with any one of the touch points 106" (*id.* at 4:52–55), and (3) how "[s]ystem 100 may be configured to continuously monitor for system predefined criteria, at step 214, and store the monitored information, at step 216, until a transaction session is determined, at step 218, to have ended" (*id.* at 5:39–42).  *See* Prelim. Resp. 8 (citing Landers Decl. ¶ 27).  According to Patent Owner, the definition and disclosures support construing "active session" as a "transaction session and includ[ing] not only 'actionable input' of a customer, but also feedback from the touch point; it is the **interaction** between the customer and the touch point."  *Id.* (citing Landers Decl. ¶ 28).

IPR2022-00055
Patent 8,862,508 B2

As an initial matter, Patent Owner does not provide a citation to the extrinsic evidence defining "session" as "a meeting or series of meetings of a body for the transaction of business." Prelim. Resp. 8. Regardless, this definition is not applicable to the invention at issue here as it relates to meetings between a *group or groups of people* in a deliberative body of some type. *See* Ex. 3003 (*The American Heritage Dictionary of the English Language* (2016) (via Credo Reference), https://search.credoreference.com/content/entry/hmdictenglang/session/0 (last visited Feb. 16, 2022) (Definition 1.a – "A meeting of a legislative or judicial body for the purpose of transacting business."). Instead, we view as more applicable *alternative* definitions of "session" as a period of time for a certain activity, such as communication between a user and a system. *See id.* (Definition 3 – "A period of time devoted to a specific activity: a recording session at a music studio; a login session that was disrupted by a power outage."); Ex. 3004 at 11 (IEEE 100: The Authoritative Dictionary of IEEE Standard Terms, *available at* https://ieeexplore.ieee.org/document/4116787) (Definition 1 – "The period of time during which a user of a terminal can communicate with an interactive system, usually equal to elapsed time between logon and logoff."). This understanding of a "session" as a period of time for certain activity is supported by references in the Specification to a "session" being "initiated" and "ended." *See, e.g.*, Ex. 1001, 4:56 (discussing how "a customer interaction session is initiated"), 5:41–42 (discussing how a "transaction session is determined . . . to have ended"). Although we need not expressly define "session" at this stage of the proceeding, the parties may wish to develop this issue at trial.

20

IPR2022-00055
Patent 8,862,508 B2

Further, even if we were to agree with Patent Owner and view an "active session" as characterized by the *nature of the activity* taking place—rather than a *period of time* during which that activity takes place—we do not agree that an "active session" *must* include "feedback from the touch point." Prelim. Resp. 8. The passages in the Specification highlighted by Patent Owner refer to a "customer's interactions" with the touch point (*see* Ex. 1001, 4:46–55, *cited at* Prelim. Resp. 8) but do not mention any feedback or response by the touch point. To the extent Patent Owner implicitly contends that one of ordinary skill in the art would have understood the terms "interacts" and "interactions" (*see* Ex. 1001, 4:49, 4:53) as requiring *reciprocal activity*, the record at this stage does not support that understanding by one of ordinary skill in the art. *See Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1359 (Fed. Cir. 2018) (rejecting attorney argument as to the alleged understanding of one of skill in the art on an issue when no evidence was presented). Moreover, even if "interactions" would have been understood as both input from a customer and response from the system, the passages cited discuss the *capabilities* of the system and do not define an "active session" as requiring a response from the system. *See* Ex. 1001, 4:46–55, 5:39–42. The Landers Declaration largely tracks the Preliminary Response and does not add to the discussion on this issue. *Compare* Prelim. Resp. 8, *with* Landers Decl. ¶¶ 27–28. For these reasons, we are not persuaded to adopt Patent Owner's proposed construction of "active session" at this stage of the proceeding.

IPR2022-00055
Patent 8,862,508 B2

>    4.    *"subsequent to said monitoring, selecting in real-time said*
>    *targeted marketing content correlated to said user-defined*
>    *preferences" (claims 1 and 7)*

Element 1.H and element 7.H each recite "subsequent to said monitoring, selecting in real-time said targeted marketing content correlated to said user-defined preferences" ("the 'subsequent to said monitoring' limitation"). *See* Ex. 1001, 9:15–17, 10:9–11. Patent Owner argues that, "[a]ccording to the language of 'subsequent to said monitoring, selecting in real-time said targeted marketing content correlated to said user-defined preferences,' the selection of targeted marketing content is based on both the subsequence of the monitoring and the user-defined preferences." Prelim. Resp. 9. Patent Owner also states that "[t]he context of claim 1 also demonstrates that subsequence of the monitoring is a determination factor to select targeted marketing content" in that element 1.G—"monitoring via said server an active session in real-time for selection of targeted marketing content correlated to said user-defined preferences"—shows that "the purpose of monitoring the active session in real-time is to select of targeted marketing content." *Id.* (citing Landers Decl. ¶ 31).

We need not expressly construe the "subsequent to said monitoring" limitation because doing so would not change the result of the analysis below. *See Nidec Motor*, 868 F.3d at 1017. To the extent that Patent Owner contends that "subsequent to said monitoring" requires that the "monitoring" of the "active session" in element 1.G (for example) must have completely ended *before* the "selecting" step in element 1.H (for example) can begin, we disagree at this stage of the proceeding. Instead, we find the record at this stage to support the view that the "monitoring" need not cease before the process performs later-recited steps, such as elements 1.H and 1.I.

IPR2022-00055
Patent 8,862,508 B2

First, under Patent Owner's apparent understanding, the language of elements 1.G and 1.H would directly conflict in that the "monitoring" is expressly "for selection of targeted marketing content correlated to said user-defined preferences" in element 1.G, but that same "monitoring" must cease *before* the *actual* "selecting" of the "targeted marketing content correlated to said user-defined preferences" recited in element 1.H.

Second, the record supports that "monitoring" of the "active session" continues throughout the session. For example, element 1.I indicates that the system may use a response by the user as to the original "targeted marketing content" to "determine whether transmission of additional information related to said marketing content occurs during said active session." In addition, the Specification expressly discloses that "monitoring" occurs *continuously* during the entire "session." *See* Ex. 1001, 5:39–42 ("System 100 may be configured to continuously monitor for system predefined criteria, at step 214, and store the monitored information, at step 216, until a transaction session is determined, at step 218, to have ended.").

### C. *Asserted Obviousness of Claims 1, 3, 5–7, 9, 11, and 12 Based on Lawlor, Bouve, De Leo, and Looney*

Petitioner asserts that claims 1, 3, 5–7, 9, 11, and 12 of the '508 patent would have been obvious under 35 U.S.C. § 103(a) based on Lawlor, Bouve, De Leo, and Looney. Pet. 6, 15–60. Patent Owner provides arguments addressing this asserted ground. Prelim. Resp. 16–25. We first summarize aspects of the prior art.

#### 1. *Lawlor*

Lawlor discloses "a method and system for distributing financial and other services to remote locations, and more specifically, provides banking

IPR2022-00055
Patent 8,862,508 B2

type financial transaction handling via remote data terminals located in users' homes, offices or other locations (i.e., 'home banking' or 'remote banking')." Ex. 1004, 1:13–18.

Figure 1 of Lawlor is reproduced below:



Figure 1 of Lawlor is "a block diagram . . . of a financial services distribution system." Ex. 1004, 16:58–59. Financial services distribution system 50 shown in Figure 1 includes, among other aspects, fault-tolerant central computer system 52, a plurality of remote terminals 54, and digital packet network switch 56. *See id.* at 17:18–28. Central computer 52 "interfaces with banking institutions and with other financial institutions 64 through the existing conventional automatic teller machine (ATM) interchange switch 66." *Id.* at 17:61–64. In addition, central computer 52 "electronically communicates with additional remote data processing systems such as the Federal Reserve ACH 72 (e.g., via a Federal Reserve Bank data processing system 74), debit networks 76, wholesalers/remittance processors 78, direct payee computer systems 80, third party information

IPR2022-00055
Patent 8,862,508 B2

providers 82 and advertisers 84." *Id.* at 18:35–40.  Lawlor discloses that central computer 52 is programmed "to perform various billpaying and other financial functions and to distribute billpaying and other services to remote terminals 54 on demand." *Id.* at 19:8–12.

### 2. *Bouve*

Bouve discloses a system and method of retrieving and managing information stored in a remote database by an operator using a computer system.  Ex. 1006, codes (54), (57), 5:39–52.

Figure 1 of Bouve is reproduced below:



FIG. 1

Figure 1 depicts a system 10, which includes, among other aspects, database 12 with information controller 14, which includes display 40 and keyboard 42.  *See* Ex. 1006, 4:53–59, 5:39–42.  Controller 14 communicates with remote access port 16 via communications link 18.  *See id.* at 4:56–59.

### 3. *De Leo*

De Leo discloses a "system and method for providing information and services to and from an automated teller machine."  Ex. 1005 ¶ 2.

IPR2022-00055
Patent 8,862,508 B2

Figure 8 of De Leo is reproduced below:



Figure 8 depicts "a multi-channel interactive distribution system for the interconnection of automated teller machines and the Internet." Ex. 1005 ¶ 17. The system in Figure 8 includes, among other aspects, server 218, which includes database 224 and personal preferences list 228, as well as ATM 202. *See id.* ¶ 80. De Leo discloses that targeted advertisements, based on user preferences, can be sent to customers when interacting with ATMs. *See id.* ¶¶ 82, 90–91, 111.

    *4.  Looney*

Looney "relates generally to data collection and message presentation systems" and, in particular, "relates to architecture for presenting a personalized advertising message." Ex. 1007, 1:15–18.

IPR2022-00055
Patent 8,862,508 B2

Figure 2 of Looney is reproduced below:



Figure 2

Figure 2 depicts an "example for a personalized marketing architecture." Ex. 1007, 2:43–44. The exemplary architecture depicted includes, among other aspects, "data gathering and management 222, analysis of the data 224, campaign/content creation 226, campaign execution 228, and campaign measurement 230." *Id.* at 5:9–13. The architecture also may include real-time advertisement targeting engine 246, which, according to Looney, "identifies and selects a personalized advertising message to be targeted to an individual that will have customer-specific information and content." *Id.* at 8:59–64.

### 5. *Analysis*

#### a. *Independent Claim 1*

For independent claim 1, Petitioner contends that the proposed combination of Lawlor, Bouve, De Leo, and Looney discloses each

IPR2022-00055
Patent 8,862,508 B2

limitation.  Pet. 15–54.  To support its arguments, Petitioner identifies
certain passages in the cited references and explains the significance of each
passage with respect to the corresponding claim limitation.  *Id.*  Petitioner
also articulates reasons to combine the relied-upon aspects of Lawlor,
Bouve, De Leo, and Looney.  *Id.*  Patent Owner (1) argues that the proposed
combination fails to teach or suggest the "control console" limitation
(reciting "at least one computer system configured with at least one control
console") in element 1.A, (2) argues that the proposed combination fails to
teach or suggest the "subsequent to said monitoring" limitation  (reciting
"subsequent to said monitoring, selecting in real-time said targeted
marketing content correlated to said user-defined preferences") in element
1.H, and (3) challenges the sufficiency of Petitioner's obviousness analysis.
*See* Prelim. Resp. 16–25.

We have reviewed Petitioner's contentions with respect to claim 1,
and for the reasons below, we determine that the Petition shows a reasonable
likelihood that Petitioner would prevail in demonstrating that claim 1 would
have been obvious based on Lawlor, Bouve, De Leo, and Looney.  We
address in turn each of Patent Owner's arguments.

*(1) The "Control Console" Limitation*

Petitioner argues that Lawlor discloses, or renders obvious, element
1.A, alone or in combination with Bouve.  *See* Pet. 16–24.  Specifically, in
the discussion of element 1.A, which includes the "control console"
limitation (i.e., "at least one computer system configured with at least one
control console"), Petitioner provides the following annotated version of
Figure 1 of Lawlor:

28

IPR2022-00055
Patent 8,862,508 B2



Pet. 18.  Figure 1 of Lawlor is "a block diagram . . . of a financial services distribution system."  Ex. 1004, 16:58–59.  In the annotated version of Figure 1 here, Petitioner added (1) red highlighting  to central computer 52, (2) yellow highlighting  to Remote Terminals 54, (3) blue highlighting  to Members Banks 64 and Bank 74, and (4) green highlighting  to connections. Pet. 18.

Petitioner identifies  central computer 52 as the recited "multi-channel server" in element 1.A.  Pet. 17–18 (citing Ex. 1004, Fig. 1, 17:29–33, 19:7–12; Jestice Decl. ¶ 86).  Petitioner states that central server 52 is coupled to "at least one computer system configured with at least one control console," which "resides with the member banks 64 and bank 74 (blue) and/or with the operator of the Lawlor's central computer 52" (red).  Pet. 17 (citing Ex. 1004, Fig. 1, 18:11–54; Jestice Decl. ¶¶ 86–87).  Petitioner also presents a discussion as to why one of ordinary skill  in the art "would have understood from Lawlor's disclosure that Lawlor's central computer 52 [(in

IPR2022-00055
Patent 8,862,508 B2

red above)] is *coupled to at least one computer system configured with at least one control console*." Pet. 19 (citing Jestice Decl. ¶¶ 86–87); *see* Pet. 19–20 (citing Jestice Decl. ¶¶ 53, 86–87) (entire discussion).

In the alternative, Petitioner states, "[t]o the extent Lawlor does not render obvious *at least one computer system configured with at least one control console*, Bouve does." Pet. 21 (citing Jestice Decl. ¶ 92). According to Petitioner, "Bouve discloses that operators need to 'add and modify the information within [a] database'" (Pet. 21 (citing Ex. 1006, 5:39–52; Jestice Decl. ¶ 93)), which "can be done using a 'controller' (a *computer system*) that 'preferably includes a display 40 and a keyboard 40' (a *control console*) and 'through control of a system operator typing commands at the keyboard 42'" (*id.* (citing Jestice Decl. ¶ 93)). Petitioner also discusses why one of ordinary skill in the art would have been motivated to combine Lawlor and Bouve and would have had a reasonable expectation of success as to element 1.A. *See* Pet. 21–24.

Patent Owner argues that none of the references in the proposed combination teach or suggest the "control console" limitation in element 1.A. *See* Prelim. Resp. 18–21. As to Lawlor, Patent Owner first states that Petitioner relies on inherency as to the "control console" limitation, and Patent Owner then quotes a large portion of Petitioner's discussion of element 1.A. *See id.* at 18–19 (quoting Pet. 20). Patent Owner continues that, "[a]ccording to Petitioner, Lawlor inherently teaches at the most that central computer 52 or the member banks includes a computer system configured with at least one control console" and that, "[t]herefore, to the extent Lawlor teaches 'at least one computer system configured with at least one control console,' the computer system of the Lawlor is dependent and

IPR2022-00055
Patent 8,862,508 B2

inside of the financial institution." *Id.* at 19 (citing Landers Decl. ¶ 60). According to Patent Owner, this does not meet their proposed construction of the "control console" limitation requiring that the "computer system" "is independent and outside of the financial institution, the multi-channel server and e-banking touch points." *See id.* at 19–20.

At this stage of the proceeding, Patent Owner's argument does not identify a deficiency in Petitioner's position as to the "control console" limitation. For the reasons discussed above (*see* § II.B.2), the "multi-channel server" and the "financial institution" need not be independent and outside of the "computer system." Thus, even if that the relied-upon "computer system" in Lawlor "resides with" the financial institutions "and/or" the "multi-channel server," that would not fall outside the scope of element 1.A. *See* Pet. 17 ("Lawlor's central computer 52 (red) is also *coupled to . . . at least one computer system configured with at least one control console*, which resides with the member banks 64 and bank 74 (blue) and/or with the operator of the Lawlor's central computer 52." (citing Ex. 1004, Fig. 1, 18:11–54; Jestice Decl. ¶¶ 86–87)).

For the reasons discussed by Mr. Jestice, the record at this stage of the proceeding sufficiently supports that one of ordinary skill in the art would have understood that the identified "computer system" in Lawlor would have been located with either banks 64/74 or central computer 52 in order for the system to properly operate, even though the location of the relied-upon "computer system" does not appear to be expressly discussed. *See, e.g.*, Jestice Decl. ¶ 87 ("[One of ordinary skill in the art] would have understood that with at least one computer system configured with at least one control console, as without one neither banks nor the operator of

31

IPR2022-00055
Patent 8,862,508 B2

Lawlor's system would have any access to the Lawlor's system and, thus, it would be inoperable.  After all, if the transaction cannot be processed and the advertisement cannot be loaded into Lawlor's system, the system will not be able to operate as described.").  The Landers Declaration largely tracks the Preliminary Response and does not add to the discussion on this issue or directly address Mr. Jestice's additional statements as to, for example, the understanding of one of ordinary skill in the art as to the "control console" limitation.  *Compare* Prelim. Resp. 18–20, *with* Landers Decl. ¶¶ 56–61; Jestice Decl. ¶ 87.

We turn now to Petitioner's *alternative* position relying, in part, on Bouve as to the "control console" limitation.  *See, e.g.*, Pet. 21.  Patent Owner argues that this alternative position fails because "Bouve discloses that 'the database 12 includes an information controller 14 (Ex. 1006, 4:56–59) which means that the 'controller' is with the server, not independent from the server."  Prelim. Resp. 20.

At this stage of the proceeding, Patent Owner's argument does not identify a deficiency in Petitioner's alternative position as to the "control console" limitation.  First, for the reasons discussed above (*see* § II.B.2), the "multi-channel server" need not be independent and outside of the identified "computer system."  Thus, that the relied-upon "computer system" in Bouve (controller 14) may be situated Figure 1 within a database (even if we were assume that would be understood as a "multi-channel server") does not fall outside the scope of element 1.A.  *See Cadence Pharms.*, 780 F.3d at 1369; *Anchor Wall Sys.*, 340 F.3d at 1306–07.  Second, Patent Owner's argument does not address Petitioner's position in that, even in the context of the

32

IPR2022-00055
Patent 8,862,508 B2

alternative reliance on Bouve, Petitioner continues to rely on Lawlor as to the recited "multi-channel server." *See* Pet. 16–21.

For the reasons discussed by Mr. Jestice, the record at this stage of the proceeding sufficiently supports that one of ordinary skill in the art would have understood that the identified "computer system" in Bouve satisfies the "control console" limitation. *See, e.g.*, Jestice Decl. ¶ 93, *cited at* Pet. 21. The Landers Declaration largely tracks the Preliminary Response and does not add to the discussion on this issue or directly address Mr. Jestice's additional statements as to Bouve. *Compare* Prelim. Resp. 20, *with* Landers Decl. ¶ 62; Jestice Decl. ¶ 93.

Lastly, Patent Owner argues that De Leo and Looney do not disclose the "control console" limitation (Prelim. Resp. 20–21), but Petitioner did not rely on those references as to element 1.A (Pet. 16–24).

At this stage of the proceeding and on the current record, we determine that Petitioner has made a sufficient showing that Lawlor discloses, or renders obvious, the "control console" limitation, alone and in combination with Bouve. We also determine that, as of this stage of the proceeding, the motivation to combine Lawlor with Bouve is supported by rational underpinnings and that there would have been reasonable expectation of success in the combination.

### (2) The "Subsequent to Said Monitoring" Limitation

As element 1.H, claim 1 recites: "subsequent to said monitoring, selecting in real-time said targeted marketing content correlated to said user-defined preferences" (i.e., the "subsequent to said monitoring" limitation). Ex. 1001, 9:15–17. Petitioner argues that Lawlor alone, or in view of Looney discloses, or renders obvious, this element. *See* Pet. 45–49.

33

IPR2022-00055
Patent 8,862,508 B2

Petitioner first presents an alternative relying solely on Lawlor. *See* Pet. 45–46. Petitioner states that, as discussed as to element 1.G, "Lawlor selects and transmits *targeted marketing content correlated to said user-defined preferences*" and then states that one of ordinary skill in the art "would have understood Lawlor only does so *subsequent to said monitoring*, because Lawlor describes that 'central computer 52 transmits advertising or messaging text to remote terminal 54' only if it detects a valid input from the user (and not before)." Pet. 45 (citing Ex. 1004, 39:5–7, 39:25–27); *see also* Pet. 45–46 (citing Jestice Decl. ¶¶ 174–176).

In the alternative, Petitioner states that, "[t]o the extent that it is argued that Lawlor does not disclose *selecting in real-time*," Looney "describes *selecting in real-time said targeted marketing content correlated to said user-defined preferences*." Pet. 46 (citing Jestice Decl. ¶¶ 174–184). Petitioner also discusses why one of ordinary skill in the art would have been motivated to combine Lawlor and Looney and would have had a reasonable expectation of success as to element 1.H. *See* Pet. 47–49.

Patent Owner argues that none of the references in the proposed combination teach or suggest element 1.H. *See* Prelim. Resp. 21–24. As to Lawlor, Patent Owner first highlights the claim construction arguments as to "actionable input," "active session," and the "subsequent to said monitoring" limitation (which is element 1.H) and then summarizes Petitioner's position. *See* Prelim. Resp. 21–22. Patent Owner argues that "[i]t is clear that Petitioner equates the 'active session' of the '508 Patent with 'valid input' of Lawlor." *Id.* at 22; *see also* Pet. 45 (discussing how "Lawlor describes that 'central computer 52 transmits advertising or messaging text to remote terminal 54' only if it detects a *valid input* from the user (and not before)"

IPR2022-00055
Patent 8,862,508 B2

(emphasis added) (citing Ex. 1004, 39:5–7, 39:25–27)).  According to Patent
Owner, a "'valid input' of Lawlor can only equate to 'actionable input' of
the '508 Patent, since it does not include response from the touch point."
Prelim. Resp. 22 (citing Landers Decl. ¶ 68).

At this stage of the proceeding, Patent Owner's argument does not
identify a deficiency in Petitioner's reliance on Lawlor as to element 1.H.
First, for the reasons discussed above (*see* § II.B.3–4), the "active session"
monitored in the context of claim 1 need not include a response from the
"touch point."  Thus, Petitioner's reliance on the "valid input" in Lawlor
(Pet. 45 (citing Ex. 1004, 39:5–7, 39:25–27))—even assuming there is no
response from the "touch point"—does not fall outside the scope of elements
1.G and 1.H.

The record at this stage of the proceeding sufficiently supports that
one of ordinary skill in the art would have understood that Lawlor satisfies
the requirements of element 1.H and related element 1.G.  *See* Pet. 39–49
(citing Jestice Decl. ¶¶ 155–193).  For example, the record, including the
testimony of Mr. Jestice, supports that the identified "active session" begins
when the user signs on to the system in (for example) step 360 in Figure 10
of Lawlor, and that "monitoring" of that "active session" begins occurring
concurrently.  *See, e.g.*, Pet. 39–41 (citing Jestice Decl. ¶¶ 155–156).  The
record also supports that the relied-upon "selecting in real-time said targeted
marketing content correlated to said user-defined preferences" in element
1.H occurs *after* the "monitoring" in that the "selecting" takes place in (for
example) step 380 in Figure 10 of Lawlor.  *See* Ex. 1004, 39:25–28 ("On the
other hand, if the inputted number is valid, central computer 52 transmits
advertising or messaging text to remote terminal 54---this advertising text

IPR2022-00055
Patent 8,862,508 B2

preferably being targeted to a specific user or user group (block 380)."),
*cited at* Pet. 45–46 (citing Jestice Decl. ¶¶ 174–176).  The Landers
Declaration largely tracks the Preliminary Response and does not add to the
discussion on this issue.  *Compare* Prelim. Resp. 21–22, *with* Landers Decl.
¶¶ 65–68.

    We turn now to Petitioner's alternative position relying, in part, on
Looney as to element 1.H.  *See, e.g.*, Pet. 46–47.  Patent Owner "agrees with
Petitioner's assertion that Looney disclose[s] 'selecting in real-time,'" but
Patent Owner argues that "Looney does not teach 'subsequent to said
monitoring' either."  Prelim. Resp. 23.  According to Patent Owner, "[t]he
written description of Looney shows the selection of targeted marketing
content is based on input and response of a customer, but not based on
response from the touch point."  *Id.* (citing Landers Decl. ¶ 70).

    At this stage of the proceeding, Patent Owner's argument does not
identify a deficiency in Petitioner's alternative position as to element 1.H.
First, again, for the reasons discussed above (*see* § II.B.3–4), the "active
session" monitored in the context of claim 1 need not include a response
from the "touch point."  Second, Patent Owner's argument does not address
Petitioner's position in that, even in the context of the alternative reliance on
Looney, Petitioner continues to rely on *Lawlor*—not Looney—for the nature
of the "active session" at issue in Patent Owner's arguments.  *See* Pet. 46–47
(discussing Looney but not the "subsequent to monitoring" language).

IPR2022-00055
Patent 8,862,508 B2

Lastly, Patent Owner argues that De Leo and Bouve do not disclose element 1.H (Prelim. Resp. 23–24), but Petitioner did not rely on those references as to element 1.H (Pet. 45–49).[14]

For these reasons, at this stage of the proceeding and on the current record, we determine that Petitioner has made a sufficient showing that Lawlor alone, or in view of Looney discloses, or renders obvious, element 1.H (i.e., the "subsequent to said monitoring" limitation). We also determine that, as of this stage of the proceeding, the motivation to combine Lawlor with Looney is supported by rational underpinnings and that there would have been reasonable expectation of success in the combination.

### (3) Alleged Incomplete Obviousness Analysis

Patent Owner argues that "Petitioner fails to undertake a Graham analysis, because Petitioner's combination of Lawlor, Bouve, De Leo, and Looney lacks evidence of crucial limitations of claim 1, such as the elements [1.A] and [1.H]." Prelim. Resp. 24. Patent Owner continues that, "[a]lthough Petitioner assert[s that one of ordinary skill in the art] 'would have been motivated to integrate Lawlor, Bouve, De Leo, and Looney [to] achieve several predictable benefits (Pet., 21–24; 47–49), since Petitioner fails to undertake a Graham analysis, the motivation of combination is problematic." *Id.*

This argument does not identify a deficiency in Petitioner's position. For the reasons above, we determine that Petitioner has adequately shown

---

[14] Although Petitioner relies on De Leo, in the alternative, as to element 1.G, that is for requirement that the "targeted marketing content is correlated to said user-defined preferences," not for "monitoring via said server an active session in real-time." *See* Pet. 42–43.

IPR2022-00055
Patent 8,862,508 B2

that the prior art relied upon satisfies the "control console" limitation and the "subsequent to said monitoring" limitation at this stage of the proceeding. *See supra* § II.C.5.a.1–2. Moreover, as also discussed above (*see id.*), Petitioner has adequately set forth reasons to modify the prior art as proposed (as to the alternative positions) and explained why one of ordinary skill in the art would have had a reasonable expectation of success at the proposed combinations. Stating that the motivation is "problematic" does not adequately explain the basis for the alleged deficiency. *See* Prelim. Resp. 24.

### (4) The Remaining Limitations of Claim 1

Patent Owner does not offer any arguments specifically addressing the remaining limitations of claim 1 or Petitioner's reasons to combine Lawlor, Bouve, De Leo, and Looney, as proposed. *See* Prelim. Resp. 16–25. We have reviewed Petitioner's contentions with respect to the remaining limitations of claim 1, and determine that the Petition provides a sufficient showing, at this stage of the proceeding, that the combination of Lawlor, Bouve, De Leo, and Looney satisfies each limitation, that one of ordinary skill in the art would have had reason to combine Lawlor, Bouve, De Leo, and Looney as proposed, and that one of ordinary skill in the art would have had a reasonable expectation of success in the combination. *See* Pet. 15–54.

### (5) Conclusion as to Claim 1

For the reasons above, we determine, based on the current record, that the Petition shows a reasonable likelihood that Petitioner would prevail in demonstrating that claim 1 would have been obvious based on Lawlor, Bouve, De Leo, and Looney.

IPR2022-00055
Patent 8,862,508 B2

### b. Independent Claim 7

Petitioner relies on the discussion of independent claim 1 in contending that the proposed combination of Lawlor, Bouve, De Leo, and Looney discloses each limitation of independent claim 7. Pet. 57–60.

For independent claim 7, Patent Owner relies on the argument addressing element 1.H (i.e., the "subsequent to said monitoring" limitation), which is the same as element 7.H. *See* Prelim. Resp. 25. Patent Owner does not present any argument addressing claim 7 that does not also address claim 1. *Id.* Because the Petition shows a reasonable likelihood that Petitioner would prevail with respect to at least one of the challenged claims (*see infra* § II.C.5.a), we include claim 7 in the instituted *inter partes* review. *See SAS*, 138 S. Ct. at 1354, 1359–60; 37 C.F.R. § 42.108(a).

### c. Dependent Claims 3, 5, 6, 9, 11, and 12

For dependent claims 3, 5, and 6 (which depend from claim 1), and for dependent claims 9, 11, and 12 (which depend from claim 7), Petitioner contends that the proposed combination of Lawlor, Bouve, De Leo, and Looney discloses each limitation. Pet. 54–56, 60. Patent Owner does not present any arguments specifically addressing claims 3, 5, 6, 9, 11, and 12. *See* Prelim. Resp. 25. We include claims 3, 5, 6, 9, 11, and 12 in the context of this asserted ground in the instituted *inter partes* review. *See SAS*, 138 S. Ct. at 1354, 1359–60; 37 C.F.R. § 42.108(a).

### D. Asserted Obviousness of Claims 13, 15, 16, 19, and 20 Based on Lawlor, Bouve, De Leo, Looney, and Kawan

Petitioner asserts that claims 13, 15, 16, 19, and 20 of the '508 patent would have been obvious under 35 U.S.C. § 103(a) based on Lawlor, Bouve, De Leo, Looney, and Kawan. Pet. 6, 61–69. Patent Owner provides

IPR2022-00055
Patent 8,862,508 B2

arguments addressing this asserted ground.  Prelim. Resp. 25–28.  We first
summarize aspects of Kawan.

> *1.  Kawan*

In this asserted ground, Petitioner relies on Kawan, in addition to
Lawlor (summarized above (*see* § II.C.1)), Bouve (summarized above (*see*
§ II.C.2)), De Leo (summarized above (*see* § II.C.3)), and Looney
(summarized above (*see* § II.C.4)).

Kawan discloses "a financial system which utilizes wireless, portable
terminals for providing financial information and performing financial
transactions."  Ex. 1008, 1:5–9.  Figure 1 of Kawan is reproduced below:



Figure 1 depicts "a block diagram of a financial information and
transaction system."  Ex. 1008, 2:40–41.  The system in Figure 1 shows,
among other aspects, communications front end 12, which provides an
interface to financial institution 10, standard switched network 14, network

IPR2022-00055
Patent 8,862,508 B2

service provider 16, private network 18, and direct wireless service 20. *See id.* at 3:9–55. Kawan discloses that "the financial institution, such as a consumer banking institution, utilizes an automated system, including a host computer, for maintaining records of customer accounts" and that the records "are used to keep track of funds in the customer accounts, to enter debits and credits made to such accounts, and for other purposes." *Id.* at 3:3–8.

### 2. Analysis

#### a. Independent Claim 13

For independent claim 13, Petitioner contends that the proposed combination of Lawlor, Bouve, De Leo, Looney, and Kawan discloses each limitation. Pet. 61–67.

For independent claim 13, Patent Owner relies on the argument addressing element 7.H (and 1.H) that the relied-upon prior art does not teach or suggest "said targeted marketing content correlated to said user-defined preferences is selected subsequent to said monitoring," as recited in element 13.H. *See* Prelim. Resp. 27–28. Patent Owner does not present any argument addressing claim 13 that does not also address claims 1 and 7. *Id.* Because the Petition shows a reasonable likelihood that Petitioner would prevail with respect to at least one of the challenged claims (*see infra* § II.C.5.a), we include claim 13 in the instituted *inter partes* review. *See SAS*, 138 S. Ct. at 1354, 1359–60; 37 C.F.R. § 42.108(a).

#### b. Dependent Claims 15, 16, 19, and 20

For dependent claims 15, 16, 19, and 20 (which depend from claim 13), Petitioner contends that the proposed combination of Lawlor, Bouve, De Leo, Looney, and Kawan discloses each limitation. Pet. 67–68. Patent

IPR2022-00055
Patent 8,862,508 B2

Owner does not present any arguments specifically addressing claims 15, 16, 19, and 20. *See* Prelim. Resp. 28. We include claims 15, 16, 19, and 20 in the context of this asserted ground in the instituted *inter partes* review. *See SAS*, 138 S. Ct. at 1354, 1359–60; 37 C.F.R. § 42.108(a).

### E. *Asserted Obviousness of Claims 4 and 10 Based on Lawlor, Bouve, De Leo, Looney, and Arsenault*

Petitioner asserts that claims 4 and 10 of the '508 patent would have been obvious under 35 U.S.C. § 103(a) based on Lawlor, Bouve, De Leo, Looney, and Arsenault. Pet. 6, 69–71. We first summarize aspects of Arsenault.

#### 1. *Arsenault*

In this asserted ground, Petitioner relies on Arsenault, in addition to Lawlor (summarized above (*see* § II.C.1)), Bouve (summarized above (*see* § II.C.2)), De Leo (summarized above (*see* § II.C.3)), and Looney (summarized above (*see* § II.C.4)).

Arsenault relates "generally to digital video transmission systems and, more particularly, to a system and method of transmitting, receiving and

IPR2022-00055
Patent 8,862,508 B2

displaying advertisements via a digital video transmission system."
Ex. 1009, 1:13–16.  Figure 7 of Arsenault is reproduced below:



Figure 7 depicts "an exemplary flow diagram illustrating one method of processing advertising objects" within an exemplary integrated receiver decoder.  Ex. 1009, 2:62–64.  As to step 256, Arsenault discloses that the integrated receiver decoder

> identifies expired AOs [(advertising objects)] by referring to the ULO [(update list object)].  The ULO contains only unexpired AOs.  Thus, the IRD [(integrated receiver decoder)] 36 will only cache AOs that are currently contained in the ULO and will discard currently cached AOs that are not currently in the ULO (i.e., those that are expired).

43

IPR2022-00055
Patent 8,862,508 B2

Ex. 1009, 14:35–40.

### 2. Analysis

Claim 4 depends from claim 1, and claim 10 depends from claim 7. Patent Owner does not present any arguments specifically addressing claims 4 and 10. *See* Prelim. Resp. 28–29. We include claims 4 and 10 in the context of this asserted ground in the instituted *inter partes* review. *See SAS*, 138 S. Ct. at 1354, 1359–60; 37 C.F.R. § 42.108(a).

### F. Asserted Obviousness of Claim 18 Based on Lawlor, Bouve, De Leo, Looney, Kawan, and Arsenault

Petitioner asserts that claim 18 of the '508 patent would have been obvious under 35 U.S.C. § 103(a) based on Lawlor, Bouve, De Leo, Looney, Kawan, and Arsenault. Pet. 6, 71.

### 1. Asserted References

In this asserted ground, Petitioner relies on Lawlor (summarized above (*see* § II.C.1)), Bouve (summarized above (*see* § II.C.2)), De Leo (summarized above (*see* § II.C.3)), Looney (summarized above (*see* § II.C.4)), Kawan (summarized above (*see* § II.D.1)), and Arsenault (summarized above (*see* § II.E.1)).

### 2. Analysis

Claim 18 depends from claim 13. Patent Owner does not present any arguments specifically addressing claim 18. *See* Prelim. Resp. 30. We include claim 18 in the context of this asserted ground in the instituted *inter partes* review. *See SAS*, 138 S. Ct. at 1354, 1359–60; 37 C.F.R. § 42.108(a).

## III. CONCLUSION

For the reasons above, we determine that the Petition shows a reasonable likelihood that Petitioner would prevail with respect to at least

44

IPR2022-00055
Patent 8,862,508 B2

one of challenged claims 1, 3–7, 9–13, 15, 16, and 18–20 of the '508 patent.

At this stage of the proceeding, no final determination has yet been made

with regard to the patentability of any of the challenged claims or any

underlying factual or legal issues, including the construction of claim terms.

The final determination will be based on the record as developed during the

*inter partes* review.

## IV. ORDER

Accordingly, it is hereby:

ORDERED that, pursuant to 35 U.S.C. § 314(a), *inter partes* review is

hereby instituted as to claims 1, 3–7, 9–13, 15, 16, and 18–20 of the '508

patent on all asserted grounds and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and

37 C.F.R. § 42.4, *inter partes* review shall commence on the entry date of

this Decision, with notice hereby given of the institution of a trial.

IPR2022-00055
Patent 8,862,508 B2

FOR PETITIONER:

David M. Tennant
ALLEN & OVERY LLP
david.tennant@allenovery.com

David C. Seastrunk
Jung Hahm
UNIFIED PATENTS, LLC
david@unifiedpatents.com
jung@unifiedpatents.com

FOR PATENT OWNER:

William P. Ramey, III
Jacob B. Henry
RAMEY & SCHWALLER, LLP
wramey@rameyfirm.com
jhenry@rameyfirm.com
uspto@rameyfirm.com